Robinson, Appellant, v. Wirts.

Argued November 19, 1956. Before STERN, C. J., JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Martin J. Cunningham, Jr.,* for appellant.

*Philip H. Strubing,* for appellee.

OPINION BY MR. CHIEF JUSTICE HORACE STERN, December 29, 1956:

The law in this State as to the nature of the evidence required to sustain an action against a physician or surgeon for malpractice has been thoroughly charted. Its application to the facts in the present case fully supports the action of the court below in entering a nonsuit.

Plaintiff, Hannah Robinson, a woman 45 years of age, visited Jefferson Hospital in Philadelphia in February, 1953, for a gastroscopic examination for the detection of possible cancer. The examination was made by defendant, Dr. Charles Wilmer Wirts, Associate Professor of Medicine and Head of the Division of Gastro-enterology at the Hospital, who, as a specialist, had been regularly performing such examinations for many years. While it was an operation that would normally take but a few minutes, it was apparently more than of a merely casual or routine nature, as is somewhat evidenced by the fact that the patient received prior medication of demerol and a hypodermic injection of atrophine sulfate,—sedatives given to in-

duce relaxation of the muscles of the esophagus and stomach during the course of the examination. The operation itself consisted of the insertion into the esophagus of a gastroscope, which is a flexible tube approximately three feet in length and three-eighths of an inch in diameter, with a soft rubber tip to guide the instrument downward and with a light at the end to permit of a visual examination of the interior of the stomach for cancerous or other diseased conditions.

In this instance the gastroscope was passed along with ease until the cardia or esophageal orifice of the stomach was reached; there an obstruction was encountered, apparently due to spasm. Dr. Wirts explained that such spasm occurred .at times because of the natural tendency of the esophagus to repel a foreign object. He testified that he applied gentle pressure and insufflation aimed to distend the walls of the stomach and esophagus so as to clear the passage for the tube, which he stated was the normal and recognized method in such cases of overcoming the obstacle created by the spasm. The patient, however, showed signs of distress, and an emphysema of the upper abdomen, neck and cheek occurred which made the doctor suspect a possible puncture of the wall of the esophagus; accordingly he immediately removed the tube and had the plaintiff taken to the surgical ward where it was discovered that there was in fact a puncture approximately an inch to an inch and a quarter in size, requiring a thoracotomy for the removal of a rib and the suturing of the puncture.

The present action was instituted by plaintiff to recover damages for pain and suffering, the disfigurement caused by the incisional scar across her body, and her expenditures for medicines and medical treatment. At the trial the only evidence produced by her, in ad-

dition to her own testimony as to what occurred, was that of defendant, called as for cross-examination.[1] The trial judge entered a nonsuit which the court en banc subsequently refused to remove.

The reason for the entry of the nonsuit was that plaintiff had not offered any expert medical testimony to prove that defendant had inserted or manipulated the gastroscope improperly or had done anything else contrary to standard practice in treating the patient. Plaintiff contends that the jury should have been allowed to infer negligence on his part from the mere fact of the happening of the occurrence and that there was applicable the so-called exclusive control doctrine, namely, that where the thing which causes the injury is under the management of the defendant and something untoward happens that ordinarily would not occur if the one having the management used proper care, it affords reasonable evidence, in the absence of explanation by the defendant, that the happening arose from a want of care, and the burden is placed upon the defendant to establish freedom from fault.

Unfortunately for plaintiff the law is definitely to the contrary. Three very recent cases on the subject are *Bierstein v. Whitman*, 360 Pa. 537, 62 A. 2d 843; *Scacchi, Admr. v. Montgomery*, 365 Pa. 377, 75 A. 2d 535; and *Powell v. Risser*, 375 Pa. 60, 99 A. 2d 454. They merely follow a long train of authorities in this Commonwealth[2] to the same effect, holding that no

---

[1] At the conclusion of plaintiff's cross-examination of the defendant the latter's counsel interrogated him but only within the scope of the subject matter of the cross-examination, by all of which, therefore, plaintiff was bound.

[2] Examples: *Williams v. LeBar*, 141 Pa. 149, 21 A. 525; *De Long v. Delaney*, 206 Pa. 226, 55 A. 965; *Stemons v. Turner*, 274 Pa. 228, 117 A. 922; *Nixon v. Pfahler*, 279 Pa. 377, 124 A. 130; *Tremaine, Exrx. v. H. K. Mulford Company*, 317 Pa. 97, 176 A.

presumption or inference of negligence arises merely because the medical care or surgical operation terminated in an unfortunate result which might have occurred even though proper care and skill had been exercised, and where the common knowledge or experience of laymen is not sufficient to warrant their passing of judgment. In such cases the doctrine of res ipsa loquitur or of exclusive control may not be invoked, and expert testimony in support of the plaintiff's claim is an indispensable requisite to establish a right of action.

In the *Bierstein* case, which was an action against a dentist to recover damages because of alleged negligent treatment in extracting the plaintiff's tooth, resulting in the fracture of her jaw, the court pointed out, in an opinion by the late Mr. Justice ALLEN M. STEARNE (pp. 541, 542, A. pp. 844, 845), that all that had been shown was that the defendant did certain things and failed to do other things, but that there was no evidence as to whether a careful and competent practitioner would have done otherwise. Accordingly the opinion proceeded to state that "It is argued . . . that a jury of laymen under the present facts could find negligence in the same manner as in any other tort action. It is urged that a lay jury might find that plaintiff's jaw was found to have been broken, and from this fact might conclude that defendant had used unwarranted force and was therefore negligent. We disagree with such doctrine. . . . Negligence may not be *inferred* by *laymen* merely because the jaw was found to have been broken. A jaw could be broken even though there was no lack of care or skill by the dentist. *Expert* testimony is necessary to establish negligent prac-

212; *Wohlert v. Seibert,* 23 Pa. Superior Ct. 213; see also Wigmore on Evidence (3d ed.), Vol. VII, §2090, p. 453.

tice in any profession. . . . As plaintiff failed to offer any *expert* witness to establish the measure of professional skill required of a dentist in extracting a tooth, she did not meet the burden of establishing, by the weight of the evidence, that defendant failed to treat her with reasonable and ordinary professional skill. . . . In all such *malpractice cases* this Court has uniformly applied the above principles:" [citing many cases]. Accordingly, the court affirmed the entry of a compulsory nonsuit by the trial court.

In the *Scacchi* case, which was an action against a surgeon for alleged negligence in the performance of an operation to remove the patient's right tube and ovary because of an ovarian cyst, it was alleged that the ligature was not properly placed and tied after the operation so as to prevent hemorrhages, whereby a second operation was required from which the patient died. The court affirmed the action of the lower court in entering a nonsuit. It was said (p. 379, A. p. 536) : "The plaintiff had the burden of proving Dr. Montgomery's negligence and in a case such as this it could be proved only by expert testimony to establish negligence in the operation or a procedure which was not in accord with standard medical practice or negligence in his treatment of the patient after the operation:" [citing authorities].

In the *Powell* case, which was an action to recover damages for injuries to the plaintiff's hands alleged to have been sustained by reason of the improper conduct of defendant doctors in directing the administration of a wet pack to plaintiff who suffered from a manic depressive psychosis, a judgment for plaintiff entered in the trial court was reversed, and it was said (pp. 65, 66, 67, A. pp. 456, 457) : "It has been uniformly held that expert testimony is necessary to establish negli-

gent practice in any profession: . . . In the instant case the plaintiff failed to show by any expert testimony just what Dr. Risser should have done or refrained from doing. . . . Since, to make out a case, the plaintiff must show by expert testimony that there was a deviation from proper practices in the administration of the wet packs, and since he failed to do so, the doctrine of exclusive control is not in this case."

It is thus abundantly clear that since, in all such malpractice cases involving an appraisal of the propriety and skill of a doctor or surgeon in his professional treatment of a patient, a lay jury would presumably lack the necessary knowledge and experience to render a just and proper decision, they must be guided by the testimony of witnesses having special or expert qualifications. The only exception to this otherwise invariable rule is in cases where the matter under investigation is so simple, and the lack of skill or want of care so obvious, as to be within the range of the ordinary experience and comprehension of even nonprofessional persons, as, for example, where a gauze pad is left in the body of a patient following an operation (*Davis v. Kerr*, 239 Pa. 351, 86 A. 1007), or where a dentist, in working on a tooth, uses a tool with a small rotating emery disc at the end and allows it to slip and to remain revolving in the patient's mouth, grinding and tearing her tongue (*Dux v. Shaver*, 105 Pa. Superior Ct. 344, 161 A. 481). So, likewise, there might be imagined a case where a surgeon engaged in removing a tumor from a patient's scalp would let his knife slip and cut off his patient's ear, or where he undertook to stitch a wound on his patient's cheek and by an awkward move would thrust his needle into the patient's eye. It would be a matter of common knowledge and observation that such things do not ordinarily

attend the service of one exercising ordinary skill and experience in the work of surgery because they involve ulterior or extraneous acts or omissions the judgment of which would not require scientific opinion. But such is not the present case. Here it certainly could not be said that the injury to the wall of the esophagus—similar to the fracture of the jaw in the *Bierstein* case—indicated that the gastroscopic examination must have been conducted negligently, or that the application of gentle pressure and insufflation in order to pass the gastroscope beyond the obstacle caused by the spasm was not in accord with the ordinary and approved procedure of gastro-enterologists engaged in such specialized practice; on the contrary, the only evidence in that regard at the trial was the testimony of defendant, called by plaintiff as for cross-examination, that it followed the normal and recognized practice under the circumstances. The mere fact that the puncture occurred, due, as it well may have been, to an abnormally weak wall of the esophagus or to other natural causes, did not, under all the authorities, justify the application to the case of the doctrine of res ipsa loquitur or of exclusive control.[3]

Order affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

On February 26, 1953, Hannah Robinson, a school teacher and at the time 45 years of age, underwent a gastroscopic examination at the hands of Dr. Charles W. Wirts in the Jefferson Hospital in Philadelphia.

---

[3] For a comprehensive and illuminating article covering the subject matter of this appeal see "Comment, Torts—Malpractice—Medicolegal Relations—Expert Testimony," 2 Villanova Law Review, p. 95, et seq.

The examination consists of the lowering through the mouth, throat and esophagus into the stomach of a tube 77 centimeters long, 9 millimeters in diameter, and equipped with a soft rubber tip plus a light for exploration. When the tube was two-thirds of the way down, an impassable obstruction was encountered. The doctor attempted to force the tube through the obstacle by applying "gentle pressure" and pumping air into the cavity. While doing this he noted the patient became very restless and that soon her right eye began to swell. At the same time he noted her neck distending with air or gas. He turned to his two assistants and remarked: "Her esophagus is punctured." The patient was immediately taken to the surgical ward, and an operation followed. A nurse asked her if she desired the services of a priest. Another nurse encouragingly remarked to her: "If you come out of this, we will celebrate".

When the patient regained full consciousness, having been semi-conscious for 5 or 6 days, she learned that her esophagus had sustained a serious ripping, and that in order to get to the damage, surgeons were compelled to saw away one of her ribs and then, in suturing the punctured esophagus, use 45 stitches. She brought an action in trespass against Dr. Wirts, charging him with negligence in the manner in which he performed the gastroscopy. The lower Court entered a compulsory nonsuit and the plaintiff appealed. This Court has affirmed the nonsuit.

The Majority Opinion begins with the statement: "The law in this State as to the nature of the evidence required to sustain an action against a physician or surgeon for malpractice has been thoroughly charted."

If the charted course referred to by the Majority is one which conducts to the harbor of justice, it should

by all means be adhered to, but if it leads to injustice and the shipwreck of a person's proper claim, the course should be re-studied, re-appraised, and, if necessary, re-charted. No capable navigator follows a course which is taking him to projecting rocks, visible shoals, and palpable disaster.

It is not certain, however, that the law is as insensitive to the demands of injured rights as the Majority Opinion would suggest. The Majority insists that the plaintiff cannot have her claim considered by a jury unless she bolsters the evidence in her case with expert testimony. But expert testimony is not conclusively binding on a jury. In *Brueckner v. Pittsburgh,* 368 Pa. 554, 558, this Court said: "The admission of opinion evidence by experts, however, has never been held to take away from the jury its power and duty to determine the evidentiary facts."

In *Snedeker Estate,* 368 Pa. 607, this Court disparaged the value of expert or opinion testimony by saying: "Opinion evidence by an expert is, of course, admissible but as we said in Henry's Estate, 276 Pa. 511, 513, 120 A. 454, 'opinion evidence, standing alone, as it did, would not sustain a finding of forgery, in the face of the direct and credible evidence . . .'"

A layman reading the opinions of this Court on the subject of expert testimony might wonder why it is that two diametrically opposing views are projected on the value of such testimony. For instance, in the case of *Ray v. Philadelphia,* 344 Pa. 439, 441, this Court said that expert testimony was practically worthless, using such derogatory language as: "An opinion is only that; it creates no fact. It is what someone thinks about something, and the thought may be precisely accurate or totally inaccurate, and yet represent the absolutely honest conviction of the person who expresses

it. Because of this, *opinion evidence is generally considered of a low grade, and not entitled to much weight against positive testimony of actual facts.* There is a great difference between factual and opinion testimony. In the one the witness testifies to the fact and certifies that what he says of it is true. In the other, he only testifies to his opinion that such a thing is true, and certifies only to his integrity of belief. He says he believes his opinion to be correct, but he does not warrant it to be true, and does not pretend that he cannot be mistaken."*

After so uncomplimentary an observation on expert-opinion testimony, which would suggest that it is not even fit for decent society, it must seem strange to one unfamiliar with fluctuating evidentiary values to hear this Court say, as it does here, that expert testimony is of the highest possible quality, that it is a *sine qua non* to the plaintiff's case, and that, in effect, it is a lifesaver, without which the plaintiff's case must sink into the murky, sinister, and ever-inexplicable waters of *damnum absque injuria.*

No matter how one looks at this litigation, it is impossible to say, while keeping one's eyes trained on the figure of Justice, as she imperturbably holds her scales which symbolize fair dealing between human beings, that Hannah Robinson has not been done a grievous wrong. With full faith in her doctor she related to him her symptoms of discomfort and he recommended to her an examination which he said would not last more than 3 or 5 minutes. Without describing to her the precise nature of the procedure he intended to employ, he administered a hypodermic injection,—and then night settled over her. With the coming of the dawn, she counted her ribs and discovered that one was

---

* Italics throughout, mine.

missing, she found also that she had acquired a disfiguring scar. She learned further that she had many doctor bills to pay, which she had not contracted for, and that she was confronted with the prospect of pains enduring into the uncertain future.

As Hannah Robinson bends under this unasked-for burden of woes, piled on her back, it seems to me that she is entitled, at the very least, to an opportunity to present her claim for damages for the wrong done her, before the tribunal constitutionally set up for such cases.

Of course, if it can be demonstrated that the examining doctor took every precaution and did everything possible to avoid the tragic mishap, he should not be mulcted in damages. But did he use the care required under the circumstances? When the descending gastroscope was stopped by a barrier, why did he attempt to force the passage? Could he not have withdrawn the instrument, could he not have paused in deliberation and re-study, and then perhaps try again following an interval? Since the examination was to last only 3 or 5 minutes, and the patient was under sedation, nothing would have been lost by waiting until conditions were more conducive to an easy propulsion of the 9-millimeter tube. Even if the examination had to be postponed for a day or two, prudence would have dictated such a course in preference to one which encompassed the grave risk of causing death or crippling injury.

There is nothing so complicated about this case that it cannot be understood by a jury without the intervention of expert testimony. The Majority Opinion says no expert testimony would be called for in a case where a surgeon lopped off an ear while removing a tumor from a patient's scalp. The Majority says also

that no expert testimony would be required, where a surgeon "undertook to stitch a wound on his patient's cheek and by an awkward move would thrust his needle into the patient's eye." But who, in this hypothetical case, would determine that the surgeon's action was an *"awkward"* move? The jury, of course. Why cannot the jury, then, in the lawsuit before us, determine whether the defendant was not awkward in trying to force a hose 9 millimeters in diameter past a blockage in his patient's esophagus?

In the case of *Davis v. Kerr*, 239 Pa. 351, the defendant doctor, in performing an operation on the plaintiff Mrs. Davis, left a gauze pad or sponge in the wound, to the patient's subsequent serious injury. In the ensuing lawsuit the defense was that it was customary for attending nurses to account for sponges and that the defendant had relied on them. The trial Court charged that if the practice was a reasonable one, the jury should return a verdict for the defendant. The jury found for the defendant and the plaintiff appealed. This Court reversed. Mr. Justice STEWART, speaking for a unanimous Court said that it was not enough for the surgeon to depend on the count of the sponges by the nurses. The real question was what had preceded the count by the nurses. "Here the surgeon reached the conclusion, that he had removed all the sponges, a mistaken conclusion, but verified by the nurses' count. In reaching his conclusion, did he exercise ordinary skill? We see nothing in the evidence to warrant the inference that he did not; but on the other hand, we find nothing to warrant the inference that he did, which is far more important, since the burden of showing care was upon him. Why was a foreign substance left in the parts which the operating surgeon should have removed? *It was for him to acquit himself of*

*negligence with respect to it.* The sponge escaped his observation, why? Was it so hidden and concealed that reasonable care on his part would not have disclosed it; or were conditions such that in his professional judgment further exploration by him for sponges would have endangered the safety of the patient? *In a word, did he do all that reasonable care and skill would require?* Except as one or the other of these questions can be answered affirmatively from the evidence, the law will presume to the contrary, and attribute the unfortunate consequences to his contributing negligence."

If a jury has the competence to determine whether a doctor has exercised proper care when he allows a sponge to remain in a patient's body, why would it not be qualified to determine whether a doctor used the proper care when he forced a tube through the walls of a patient's esophagus, after being warned of the danger of going ahead? It is to be noted that the defendant himself was the only one who said that *gentle* pressure was applied. The Majority Opinion points out that the puncture resulting from the pressure was approximately "an inch to an inch and a quarter in size." Should not a jury determine whether a "gentle" pressure could tear and rip cartilage, muscle, and membranes to the extent of an inch and a quarter hole? Was it not more likely a heavy pressure?

In the case of *Dux v. Shaver,* 105 Pa. Superior Ct. 344, the defendant dentist dropped a rotating emery disc in his patient's mouth, inflicting serious damage to her tongue. The verdict won by the plaintiff in the trespass action which followed was affirmed even though no expert testimony was introduced to the effect that the dentist had not used an approved technique in working on the patient's teeth. Counsel for

the defendant in the case at bar attempts to distinguish the *Dux* case from the instant one by arguing that "it was obvious that the dentist did not intend to drop the emery wheel in the patient's mouth, or touch any part of her mouth with it except her teeth." The alleged distinction is not convincing. Certainly the defendant here did not intend to puncture the plaintiff's esophagus, but he did. The question in this case is whether, holding himself out as a skilled practitioner, Dr. Wirts did what he was supposed to do.

The plaintiff does not ask that this Court award or the Court below award her money damages. She only asks that her case be sent before a jury which will determine, after hearing the defendant's explanation at length, whether or not he exercised the care which the situation demanded.

The Majority Opinion cites, in support of its affirmance of nonsuit here, the case of *Powell v. Risser*, 375 Pa. 60. This is another instance where I am constrained to say, as I said in my Dissenting Opinion in the case of *Dugan v. Pennsylvania Railroad Co.*, 387 Pa. 25, that a case badly decided does not become good authority by the mere acquisition of the patina of time. Decisions do not necessarily improve with age, like wine. If they lack logic, reason, and elementary justice they will be no more convincing tomorrow than they were yesterday. A good decision acquires, like ivory and old silver, a venerable luster with the passing of years; a bad decision, like defective metal, develops rust and soon proclaims its decay.

The decision in the case of *Powell v. Risser* is encrusted with the rust of faulty logic, unsound jurisprudence, disregard of wholesome precedent, and deficient appraisement of the basic facts which gave rise to the litigation. Reynold Powell, a young man in his

early 20's and suffering with mental illness, was committed to the Allentown State Hospital, where a Dr. Mark Risser ordered for him the treatment known as wet packs. His whole body was tightly bound in wet sheets, folded and knotted like thongs. As the wet sheets began to dry, constriction set in, disturbing the patient's breathing and causing great pain in his chest. Powell complained but after 6 hours of this treatment he was tied up in another wet-sheeted strait-jacket. No one took his pulse, no one ascertained his temperature. The hermetically tight wrappings interfered with the patient's blood circulation but neither of the two defendant doctors appeared upon the scene to examine, inquire, probe, or investigate. At the end of the first pack, one of Powell's arms was in pain. At the end of the second pack, both arms were swollen and numb; his hands, which had received the full impact of the constriction, had "puffed" to twice their normal size. Again no doctor or nurse examined Powell at this juncture; again neither his pulse nor temperature was taken; again he was swathed in the binding sheets and placed in a tub of hot water in which he remained for 5 hours.

When the vise-like sheets were removed, his hands were scarcely recognizable as hands. One witness testified that "His hands were swollen two and half to three times their normal size and resembled two raw steaks. There were blisters in the center of both palms, about the size of a half-dollar, and other blisters over his hand and fingers." The blisters were toxic and capable of spreading poison throughout the body. Dr. Norman Daley, the other defendant in the case, proceeded to cut into these blisters with an ordinary pen knife which he carried around in his pocket. He did not sterilize the blade, he took no precaution to pre-

vent infection. What could have been expected, happened. The patient felt "drawing pains," "like electrical current going through, like my fingers were going to be drawn up." The fingers began to curl toward the palm. Did it require expert testimony to prove that what the defendant did constituted tortious negligence? Every school child is taught the necessity for hygiene, every housewife knows the absolute need for cleanliness in handling all items used in feeding her infants or caring for a sick one at home. It certainly was not necessary to introduce expert testimony to show that the use of an unsterilized knife on toxic blisters would cause infection. In *Norwood v. Goeddel*, 58 Pa. Superior Ct. 500, the Superior Court said: "It is scarcely necessary to add that a physician who operates on a patient for an infectious trouble and then, without sterilizing his hands or instruments, operates on another patient, is guilty of negligence."

Prior to entering the Allentown State Hospital, Reynold Powell's hands were without defect or blemish and responded faithfully to the demands of his work which included piano tuning and carpentering. When he left the hospital those hands were in ruins. Scarred, gnarled, crippled, and deformed, they lost 60% of their normal functions. In the lower Court he recovered a modest verdict of $5,000, but this Court reversed, and entered judgment for the defendants notwithstanding the verdict. One would need to search a long time before finding a case where the facts of themselves more clearly established negligence on the part of defendant doctors than was revealed without expert testimony, in the *Powell* case. Through indolence, indifference, and outright carelessness they practically wrecked the chances for gainful employment of a young man who, already groping in the darkness of mental illness, was

then in addition, deprived of the seeing dog of his hands. The injustice of the decision in the *Powell* case is so palpable that to expatiate on it further can only increase one's moral indignation without adding to the intellectual revulsion which is complete. Time cannot dim, for me, that abhorrence, and I accordingly cannot permit citation of the *Powell* decision as authority for any case today, without repeating the protest I made at the time of the original decision.

Nor am I satisfied that the decision in the case of *Bierstein v. Whitman,* 360 Pa. 357, which the Majority also cites, is a sound one. I was not a member of this Court when the Opinion in the *Bierstein* case was handed down. There the plaintiff's jaw was broken by a dentist in the process of extracting a tooth. In affirming a nonsuit entered in the Court below, this Court said: "Negligence may not be inferred by laymen merely because the jaw was found to have been broken. *A jaw could be broken even though there was no lack of care or skill by the dentist.*" The italicized statement speaks a harsh doctrine. It is not difficult, of course, to believe that in the days when teeth were removed with a chisel and hammer, a jaw might suffer breakage even though the extraction was performed by the best blacksmith in town. But if law is supposed to keep pace with modern progress in dentistry, surgery, engineering, and every other field of science, it cannot possibly accept a fractured jaw as a normal sequence of a tooth extraction. While a dentist, who breaks a jaw, in taking out a tooth, should not be compelled ipso facto to pay damages to the injured person, he should, in the event of a lawsuit, be required to show that he used due care because, contrary to what this Court said in *Bierstein,* a broken jaw is something which just does *not* ordinarily happen when the defendant uses **due care.**

It is a mistaken concept that because the highest Court in the State declares with epigrammatic terseness an unsound proposition that the official character of the utterance will supply sense and reason to the logic-defying assertion. Suppose this Court had said in one of its opinions: "A leg could be broken during the removal of an appendix even though there was no lack of care of skill by the surgeon." Would the imprimatur of the high Court invest so bizarre an observation with logic and truth? The quoted statement in the *Bierstein* case is no less absurd than stating that normally a shoulder could be fractured in the removal of tonsils. I dare to give voice to a prophecy that the decision in the *Bierstein* case, which this Court today quotes for authority in the disposition of this case, will one day be repudiated by this Court because a declaration which opposes demonstrated phenomena can no more influence the tide of modern scientific law than King Canute's edict could shut out the waves of the Atlantic Ocean.

The appellate courts of this State have often said that: "Where the thing which causes the injury is shown to be under the management of defendant, and the accident is such as in the ordinary course of things does not happen if those who have the management use proper care, it affords reasonable evidence, in the absence of explanation by defendants, that the accident arose from a want of care and the burden is upon the defendants of establishing their freedom of fault."*

The Majority says that the exclusive control doctrine does not apply in the present case. Where could there be more exclusive control over a situation than where a surgeon is conducting an operation? The ex-

---

* *Kelly v. Yount*, 135 Pa. Superior Ct. 528; *Maltz v. Carter*, 311 Pa. 550; *Knox v. Simmerman*, 301 Pa. 1.

clusive control doctrine came into being because conditions arise where it is impossible for an injured person to know with any degree of detail what happened to him, and thus the law requires that the person in charge of the situation explain why a mishap resulted. Who can tell what a surgeon does when he explores the inner domains of a human body while the monarch of that realm is imprisoned in surgeon-made sleep?

An injured patient may not, of course, recover money damages from an attending physician merely by exhibiting untoward wounds. On the other hand, when there exists prima facie evidence of negligence, he should not be required to produce proof which is unavailable to him. What does a patient know when an anaesthetic lowers the curtains over sight, dams up the channels of hearing, deadens feeling, and blots out memory? While his heart beats on, he is helpless against the world and completely at the mercy of the masked figure wearing rubber gloves. In perhaps 99.9% of the cases the patient need have no fear, because the surgeon is even more concerned than the closest relative about repairing the break, mending the parted tissues, and restoring well-being to the person in his care. A surgeon is performing his duty under the aegis of Aesculapius.

But it can happen in some infinitesimal fraction of cases that the doctor may falter, slip, stumble, or forget, and when that happens and the patient is injured, justice requires that the doctor indemnify the victim of his human error. To immunize an erring doctor under the supposition that a monetary recovery against him may injure the medical profession, or to prevent an injured patient from recovering just damages by imposing upon him impossible conditions precedent, is to do harm not only to the victim but to the medical

fraternity itself which is dedicated to healing the sick, binding up the wounds of the fallen, and advancing the general happiness of mankind through sounder bodies and clearer minds.