604 A.2d 1003

Vicki L. MOURE, now by marriage Vicki L.M. Via, Appellee,

v.

Randall R. RAEUCHLE, D.O. and Community
General Osteopathic Hospital.

Appeal of Randall R. RAEUCHLE, D.O.

Supreme Court of Pennsylvania.

Argued May 7, 1991.

Decided Feb. 21, 1992.

Peter J. Curry, Harrisburg, for appellant.

William A. Atlee, Jr., Martin S. Hohenadel, Lancaster, for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION

McDERMOTT, Justice.

Appellant, Randall R. Raeuchle, D.O., appeals from the order of the Superior Court (McEwen, Olszewski and Popovich, JJ.; opinion by Popovich, J.; dissenting opinion by McEwen, J.) which: reversed the judgment of the Court of Common Pleas of Dauphin County; entered judgment *non obstante veredicto* in favor of appellee, Vicki L.M. Via, nee Moure, the plaintiff below; and remanded the case to the lower court with instructions to conduct a trial to determine appellee's damages.

The relevant facts, when viewed in the light most favorable to the verdict winner (appellant),[1] are as follows. On March 1, 1982, appellee, then twenty-nine (29) years old, and her then fiance, now husband, Richard Via, visited their family doctor, Leroy Sykes, M.D. The couple was concerned that appellee had not become pregnant even though they had not used any consistent form of birth control during the previous five (5) year period. Dr. Sykes tested Mr. Via and determined that his sperm were viable. Accordingly, the doctor concluded that if there was a fertility

1. The standard of review of an appellate court when called upon to review the entry of a judgment *non obstante veredicto* is that the evidence be considered in the light most favorable to the verdict winner. *Broxie v. Household Finance Company*, 472 Pa. 373, 372 A.2d 741 (1977).

problem, it was with appellee. He then recommended that appellee see appellant, Dr. Raeuchle, who was a surgeon specializing in procedures involving a laparoscope.[2]

On March 8, 1982, appellee visited appellant's office, at which time he performed a pelvic examination, which showed no abnormalities. Appellant then advised appellee of three possible procedures for determining whether she could conceive,[3] each of which was designed to determine if the fallopian tubes were open and receptive to egg and sperm migration. Appellant advised appellee that a laparoscopic procedure (a/k/a laparoscopy) was the most accurate of the three procedures and generally a short and relatively pain-free operation.

The laparoscopy is a procedure whereby a surgeon can look into a patient's abdomen and make an evaluation of the condition of the patient's organs. In appellee's case, in conjunction with the laparoscopy, appellant recommended the performance of a tubal patency test. Said test is designed to measure the ability of the fallopian tubes to accept eggs from the ovaries:[4] basically it is a test to see if the tubes are open. This test involves the injection of dye into the tubes and then a monitoring of the progression of the dye through the tubes. In a perfect fallopian tube the dye would proceed up through the tube and empty out of the end which is closest to the ovary. However, in an imperfect tube the flow of dye would be blocked and the

2. The laparoscope is a telescopic instrument inserted into the abdomen through or near the navel. The operator then views the internal organs of the patient. The laparoscope may be used in conjunction with other incision in the abdomen, through which operating instruments are inserted, so that the surgeon can view the organs through the laparoscope and manipulate and/or operate on the organs through the other incision.

3. The three procedures were: (1) a laparoscopic insertion; (2) a "Rubin" test, which involves the injection of air into the cervix; and (3) a "retrograde x-ray", which involves the injection of x-ray material into the cervix.

4. In a "normal" situation an unfertilized egg is released by the ovary and guided into the fallopian tube by tendrils known as fimbria which extend out of the tube itself. The egg is then guided down into the tube where it can become fertilized.

observer would then be able to determine the location of the blockage.

Appellant advised appellee of all the risks attendant to these two procedures. On this point, appellant testified at great length about the descriptions he gave to appellee, and, presumably, this testimony was believed by the jury. Therefore, we are bound to accept that testimony. Moreover, appellant introduced into evidence the patient consent agreement which was signed by appellee and which provided, in relevant part, as follows:

1. I hereby authorize Dr. R.R. Raeuchle and/or such assistant as may be selected by him, to treat the condition or conditions which appear indicated by the diagnostic studies already performed.

Laparoscopy—Tubal Patency Test
(Explain the nature of the condition and the need to treat such condition.)

2. The procedure(s) necessary to treat my condition (has, have) been explained to me by Dr. R.R. Raeuchle and I understand the nature of the procedure(s) to be: See Reverse Side.

(A description of the procedure(s) in the language of laymen.)

3. It has been explained to me that during the course of the operation, unforeseen conditions may be revealed that necessitate an extension of the original procedure(s) or different procedure(s) than those set forth in paragraph 2. I, therefore, authorize and request that the above named surgeon, his assistants, or his designees perform such surgical procedures as are necessary and desirable in the exercise of professional judgment. The authority granted under this Paragraph 3 shall extend to treating all conditions that require treatment and are not known to Dr. R.R. Raeuchle at the time the operation is commenced. I authorize the disposal by Hospital authorities of any tissues or parts which may be removed during the course of the operation.

4. I have been advised by my physician of certain risks and consequences that are associated or involved in the operation and alternative methods of treatment. I am aware that there are other risks, such as severe loss of blood, infection, cardiac arrest, etc., that are attendant to the performance of any surgical procedure. I am aware that the practice of medicine and surgery is not an exact science and I acknowledge that no guarantees have been made to me concerning the results of the operation or procedure.

No. 2 continued: (description to Patient) [appearing on Reverse Side of Agreement]:

Examination of the abdomen with a telescopic instrument with the treatment of any condition with the ovaries, tubes or other tissue that might be deemed necessary, including fulguration (burning of tissue) at this time. I understand that one or two incisions may be used to carry out this procedure. I also understand that in an emergency, such as bleeding or a bowel burn or puncture my abdomen may have to be opened.

Injection of a dye through the tubes to determine if the tubes are open.

*See* Defendant's Exhibit No. 2.

On March 25, 1982, appellee was admitted to Community General Osteopathic Hospital and appellant performed the laparoscopic procedure the next day. Appellant testified extensively about what occurred during the procedure. According to his testimony the laparoscope revealed that both fallopian tubes were severely damaged and "immediately [he] knew, number one, that she was probably sterile and could not get pregnant." His subsequent actions were, in part, premised on the initial diagnosis of probable infertility. Appellant noted that both fallopian tubes were "involved [with] hydrosalpinx," which is a collection of watery fluid in the tube "[t]hat is the end stage after longstanding disease of chronic inflammatory disease that is accompanied by pus in the tube." Appellant concluded that the left tube was "shot" beyond repair but that the right tube, although damaged, was possibly salvageable. Appellant then proceeded to cut off the tip of the tube "in order to provide a wide open lumen [the inner open space of a tubular organ]." Appellant also testified that his reason for cutting off this

tip was to "treat [the] disease" he found by allowing "internal drainage" which would then "prevent the reoccurrence hopefully ... a (sic) bacteria getting into this culture medium." After cutting the tip, a watery substance and the dye immediately drained from the tube, indicating that the tube was now completely open. This would also (theoretically) allow an unfertilized egg to enter the tube.

As standard operating procedure, appellant then attempted to retrieve the excised tip of the tube for testing. In the process of retrieval, he inadvertently punctured an ovarian artery, causing immediate and profuse bleeding. In response to the bleeding, appellant made a full incision into the abdomen, and with the help of another surgeon stopped the bleeding and repaired the artery.

At that point appellant, knowing that the opening he had created at the tip of the fallopian tube would close through natural processes within a three to eight day period, decided that the best course of action would be to do a salpingostomy on the right tube. A salpingostomy is a procedure which involves the use of a few small sutures to tie the end of the tube back [5] to prevent it from closing in the natural course. Such a procedure generally keeps the tube open for a three to six month period and, in some cases, for as long as a year. Appellant's decision to do the salpingostomy was related to the unexpected opening of the abdomen (necessitated by the bleeding artery): a salpingostomy is difficult to do during a laparoscopic procedure but relatively simple once there is a complete incision into the abdomen. An alternative course would have been to close appellee up after the bleeding was controlled and to recommend to her additional surgery to keep the fallopian tubes open. After the operation, appellant advised appellee of what had transpired, including the creation, by the salpingostomy, of a three (3) to six (6) month "window" during which it was possible for her to get pregnant (so long as the right tube

5. The procedure, also known as a "cuffed tuboplasty," was described by appellant's expert witness as a "little like a french cuff on a man's shirt."

did not reclose naturally). Appellee testified that she was resistent to the idea of attempting to become pregnant during the "window" period because she was not yet married; she married on September 11, 1982, five and one half (5½) months after the operation.

■ Subsequently, appellee filed the instant action against appellant and Community General Osteopathic Hospital alleging various wrongdoings. The case proceeded to trial against appellant alone on theories of negligence and lack of informed consent.[6] During the trial appellant presented the testimony of an expert, Clifford Wheeless, M.D., who testified that the procedures performed by appellant were carried out in a manner consistent with accepted standards of medical care.

The twelve (12) member jury, after only one and one half (1½) hours of deliberation, unanimously found that appellant had not been negligent and had not performed surgical procedures on appellee without her informed consent. Appellee's post-trial motion for judgment *non obstante veredicto* was denied by the trial court. On appeal, a three judge panel of the Superior Court (McEwen, Olszewski and Popovich, J.J.) reversed the trial court, with a dissent by Judge McEwen. The Superior Court held:

> We find that two reasonable minds would agree that, as a matter of law, Dr. Raeuchele (sic), D.O. failed to disclose the risks of tuboplasty prior to surgery which would have been material to the appellant's decision to undergo the treatment. Based upon this error of law, we reverse the lower court's order denying the judgment n.o.v. and enter judgment in favor of the appellant. The case is hereby remanded to the lower court with instructions to conduct a trial to determine the appellant's damages.

*Moure v. Raeuchele* (sic), 387 Pa.Super. 127, 141, 563 A.2d 1217, 1224 (1989).

**6.** An operation which is beyond the scope of the patient's informed consent constitutes a separate tort. *See Dicenzo v. Berg,* 340 Pa. 305, 16 A.2d 15 (1940).

Appellant petitioned this Court for allowance of appeal, which we granted. *See* 524 Pa. 629, 574 A.2d 70 (1990). Appellant ostensibly raises five issues for our review; however, in essence, the issues can be reduced to three: whether the Superior Court applied the incorrect standard of review; whether the Superior Court impermissibly substituted its decision for the verdict of the jury; and whether the Superior Court misapplied the law regarding informed consent. Our resolution of these issues is set out below.

■ In reviewing a motion for judgment n.o.v., "the evidence must be considered in the light most favorable to the verdict winner, and he must be given the benefit of every reasonable inference of fact arising therefrom, and any conflict in the evidence must be resolved in his favor." *Broxie v. Household Finance Company*, 472 Pa. 373, 380, 372 A.2d 741, 745 (1977). *See also, Metts v. Griglak*, 438 Pa. 392, 264 A.2d 684 (1970) and *Gonzalez v. United States Steel Corp.*, 484 Pa. 277, 398 A.2d 1378 (1979). Moreover, [a] judgment n.o.v. should only be entered in a clear case and any doubts must be resolved in favor of the verdict winner. *See Atkins v. Urban Redevelopment Authority of Pittsburgh*, 489 Pa. 344, 414 A.2d 100 (1980) and *Steward v. Chernicky*, 439 Pa. 43, 266 A.2d 259 (1970). Further, "a judge's appraisement of evidence is not to be based on how he would have voted had he been a member of the jury, but on the facts as they come through the sieve of the jury's deliberations." *Brown v. Shirks Motor Express*, 393 Pa. 367, 375, 143 A.2d 374, 379 (1958).

■ There are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law, *Tremaine v. H.K. Mulford Co.*, 317 Pa. 97, 176 A. 212 (1935), and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant, *Cummings v. Nazareth Borough*, 427 Pa. 14, 233 A.2d 874 (1967). With the first a court reviews the record and concludes that even with all factual inferences decided adverse to the movant the law nonetheless requires a ver-

dict in his favor, whereas with the second the court reviews the evidentiary record and concludes that the evidence was such that a verdict for the movant was beyond peradventure.

In the instant case the majority of the Superior Court apparently concluded that the law of informed consent compelled the entry of judgment as a matter of law. However, the court's conclusion was stated in a manner indicating that the evidence compelled a factual conclusion different from that arrived at by the jury: in pertinent part the court stated, "that two reasonable minds would agree that, as a matter of law, Doctor Raeuchele, (sic) D.O. failed to disclose the risks of tuboplasty ..." *Moure v. Raeuchele* (sic), 387 Pa.Super. 127, 141, 563 A.2d 1217, 1224 (1989). This choice of words was unfortunate, with the potential for causing confusion.

In addition to the above problem the majority of the Superior Court panel erred in another important respect, in that their analysis failed to acknowledge that there were actually two separate surgical procedures which were at issue here:[7] the initial tuboplasty and the subsequent salpingostomy.

In order to properly analyze this case it is necessary to separately view the appellant's activities as related to each procedure, and determine first, whether the initial tuboplasty was permitted, and only then to look to whether the salpingostomy was permitted. With these points in mind we must now review the propriety of the Superior Court's ultimate legal conclusion.

It must be emphasized at the outset that the jury in this case was instructed on two legal theories: negligence and lack of informed consent. On the first theory, the jury determined that appellant was not negligent. On post-trial motions, the appellee did not contest this determination and

7. The Superior Court opinion was based on reviewing the record to determine only whether appellant revealed the risks associated with the "cuffing procedure." *Moure v. Raeuchele* (sic), 387 Pa.Super. 127, 136, 563 A.2d 1217, 1222 (1989).

404

the issue of negligence was not a basis of the Superior Court's decision.[8]

On the second theory, the jury determined that the appellant's actions were within the terms of appellee's informed consent, and it was this conclusion with which the Superior Court disagreed. Thus, the issue before us is not one of negligence; the issue concerns whether appellant was permitted, within the terms of appellee's informed consent to perform the challenged surgical procedures; and in the context of this case, wherein we are reviewing the grant of judgment n.o.v., the precise issue is whether there was evidence of record in support of the jury's verdict that the appellant did have such permission.

In *Smith v. Yohe*, 412 Pa. 94, 194 A.2d 167 (1963), we stated: "The principles of law applicable to this phase of the litigation are clear. Such principles are: (a) where a patient is mentally and physically able to consult about his condition, in the absence of an emergency, the consent of the patient is 'a prerequisite to a surgical operation by his physician' and an operation without the patient's consent is a technical assault; (b) the burden is on plaintiff to prove 'that the operation performed, or substantially that operation, was not authorized by him.'" *Id.*, 412 Pa. at 106, 194 A.2d at 174 (citations omitted). Later we held that for a consent to be effective it must be informed and knowledgeable. *See Gray v. Grunnagle*, 423 Pa. 144, 223 A.2d 663 (1966).

In order for a consent to be considered informed it must be shown that the patient was advised of "those risks which a reasonable man would have considered material to

8. The position taken by Mr. Justice Papadakos in his dissenting opinion is without foundation for the following reasons: first, the jury in this case affirmatively concluded that the appellant was not negligent in his performance; second, the issue of negligence was clearly waived when plaintiff's counsel elected to pursue only the informed consent issue in his claim for post-trial relief, *see* Pa.R.Civ.P. 227.-1(b)(2). Moreover, since the tort founded upon lack of informed consent is an intentional tort, i.e. a battery, the issue of negligence is not germane. § 9 Prosser & Keeton on Torts p. 41 (1984). Thus, Mr. Justice Papadakos' comments in his footnote 1 are not responsive to the issue at hand.

his decision whether or not to undergo treatment" *Sagala v. Tavares,* 367 Pa.Super. 573, 578, 533 A.2d 165, 167 (1987) *alloc. denied,* 518 Pa. 626, 541 A.2d 1138 (1988). The determination of what is material is a jury question, and in making that determination the jury must be supplied with expert information as to the nature of the harm attendant to the procedure, and the probability of that harm occurring. Thereafter, the jury must determine whether the type of harm and the probability of its occurrence is information which a reasonable patient would consider in deciding whether to undergo the medical procedure. *Id.,* 367 Pa.Superior Ct. at 578, 533 A.2d at 167; *see also, Gray v. Grunnagle, supra.*

In order for a plaintiff to state a cause of action under this theory he or she need not establish that the unauthorized surgery was done negligently. Indeed, said surgery could have been done perfectly, and could even have had a beneficial effect on the patient, yet a cause of action could still exist; for it is the very conduct of the unauthorized procedure which constitutes the tort.

The most vivid example of this point was illustrated in the case of *Mohr v. Williams,* 95 Minn. 261, 104 N.W. 12 (1905), *overruled on other grounds, Genzel v. Halvorson,* 248 Minn. 527, 80 N.W.2d 854 (1957). In *Mohr,* a surgeon, with the patient's consent, anticipated operating on the patient's right ear. However, while the patient was under anesthesia, the surgeon realized that the right ear could be treated non-surgically but the left ear required non-emergency surgery. The surgeon then proceeded to operate on the left ear. Despite the fact that the operation in the left ear was medically sound the patient was permitted to prosecute her cause of action because the surgeon proceeded beyond the bounds of his consent.[9]

9. Notwithstanding its holding, the Minnesota Supreme Court did acknowledge that express consent was not always mandated, to wit, "And again, if, in the course of an operation to which the patient consented, the physician should discover conditions not anticipated before the operation was commenced, and which, if not removed, would endanger the life or health of the patient, he would, though no express consent was obtained or given, be justified in extending the

In this case, appellee's first theory of recovery is based on the following argument: the laparoscopy was permitted, and all intrusions appurtenant thereto were permitted; the tubal patency test was permitted, and all intrusions appurtenant thereto were permitted; however, once appellant proceeded to the tuboplasty i.e. the excising of the tip of the clubbed fallopian tube, appellant exceeded his consent, and the intrusions and effects appurtenant thereto constituted compensable injury. Appellee's rationale is that the tuboplasty constituted a separate and distinct surgical procedure which was unnecessary and which carried with it material risks and consequences which differed from the laparoscopy and tubal patency test, and that these risks and consequences were never conveyed to her.

This theory is sound in the abstract; however, the facts of record do not substantiate it. The evidence, when viewed in the light most favorable to the verdict winner, reveals that appellant conducted a lengthy interview with appellee prior to the operation. During the course of the interview, appellant testified that appellee granted him permission to take such remedial steps as he might find necessary during the operation.[10] Moreover, appellee signed a Consent Agreement by which appellant was "authorized and requested" by appellee to "perform such surgical procedures as are necessary and desirable in the exercise of professional judgment. [Moreover] the authority granted ... [extended] to treating all conditions that require treatment and are not known to [appellant] at the time the operation is commenced." Consent Agreement Paragraph 3.

█ Thus, appellee's theory is necessarily contingent on demonstrating that the tuboplasty in question was neither "necessary", nor did it constitute "treatment." On this point appellant testified that one of the reasons he performed the tuboplasty was to allow drainage of infection

operation and overcome them." *Mohr v. Williams*, 95 Minn. 261, 269, 104 N.W. 12, 15 (1905).

**10.** Appellee denied giving this consent but once again we are constrained to accept the jury's determination of credibility on this point.

which had accumulated in the tube. Appellant's expert testified that providing drainage of an infected tube was acceptable treatment and that by providing this drainage appellant had "reduce[d] the chance of recurrent pelvic inflammatory disease and reduce[d] the chance of the dreaded and deadly tubal ovarian abscess, which still is a very high killer of women with tubal infections." This evidence apparently was accepted by the jury, and clearly indicates that the actions of appellant not only qualified as "treatment" but would also have supported a conclusion that this treatment was medically "necessary." Therefore, the premise of plaintiff's first theory of recovery was effectively rebutted.

Appellee's second theory of recovery is based on the following argument: even if the initial tuboplasty constituted treatment within the bounds of her consent, appellant's decision to perform the salpingostomy constituted a separate procedure which was not conducted pursuant to appellee's informed consent in that the risks and consequences of such procedure were not previously made known to the appellee.

This argument fails for the same reason as the first, that there is sufficient evidence of record to have allowed the jury to conclude that the actions of appellant were taken in furtherance of the treatment he undertook of appellee's diseased fallopian tube. In this regard appellant's expert, upon being asked his opinion of appellant's conduct, testified that the second procedure

"was the best attempt at fixing a diseased tube—this woman by this time had—her chances of pregnancy were small, quite crystal clear. By having the abdomen open, better exposure to the tube, he could make the hole in the tube, the opening, the salpingostomy larger.

He could also have the opportunity to take back with fine sutures in a cuffed technique the opening like a morning glory flower to keep that tube open to give her the best chance she had of obtaining a pregnancy. But the more important thing than obtaining the pregnancy

was to prevent further infection that I've already mentioned can be life-threatening in these women."

Given this testimony the jury had sufficient evidence upon which to enter a verdict in favor of appellant, and we cannot say as a matter of law that appellant exceeded the scope of his consent. Therefore, we are constrained to reverse the order of the Superior Court.

Accordingly, we now reverse the order of the Superior Court and reinstate the order of the trial court denying appellee's motion for judgment n.o.v.

PAPADAKOS, J., files a dissenting opinion.

PAPADAKOS, Justice, dissenting.

I dissent. There is clear, unequivocal evidence in this record that Appellant, Dr. Raeuchle, was negligent when he "inadvertently" punctured an ovarian artery during the course of the instant operation. Subsequent unfortunate events all resulted from this act of negligence. It seems to me that the Superior Court was clearly right here to reverse a jury verdict for the doctor and the hospital and to grant judgment *n.o.v.* for Appellee. At the very least, Appellee would be entitled to a new trial.

The majority opinion is based on the theory that Appellee impliedly consented to the operation in question.[1] However, she did not, and could not, consent to the negligence that occurred. I would affirm the Superior Court in this matter.

---

1. I agree with the conclusion of footnote 8 of the majority opinion that the issue of negligence was waived. However, this is not a case of tort based on negligence but a case of tort based on lack of informed consent. See opinion, page 1006 and footnote 6.

My position is that no knowledgeable person gives informed consent to a physician to damage them through negligence during surgery and then says, "Okay, I absolve you of the negligence if you will make the necessary repairs." This is ludicrous.