# Molinaro v. Ramoska

C.P. of Philadelphia County, January Term 2003, no. 2592

*Anita L. Pitock,* for plaintiff.
*Michael J. Doyle* and *Joshua B. Axelrod,* for defendants.

RAU, *J.,* April 12, 2006—

## I. INTRODUCTION

After suffering a fall down the stairs, Ralph Molinaro, an 80-year-old man on Coumadin, a powerful blood thinning medication, was taken to defendant Methodist Hospital's emergency room at about 10:40 p.m. on the evening of January 21, 2001. It was undisputed that Mr. Molinaro was at risk for internal bleeding after a fall. The emergency room nurse responsible for Mr. Molinaro—Steven Kunz R.N.—failed to monitor the patient, failed to take and document repeat vital signs and patient assessments, and failed to report abnormal findings to a physician. Early in the morning of January 22, 2001, the

blood results showed low hemoglobin, the level of oxygenation in Mr. Molinaro's blood (pulse oxygenation) dropped significantly and his respirations increased, but Nurse Kunz did not inform a physician of these signs of internal bleeding. Hours after these abnormal findings, physicians learned of Mr. Molinaro's condition and belatedly discovered that Mr. Molinaro was bleeding into his chest. When the diagnosis of internal bleeding was finally made, the delay limited the effectiveness of the steps the doctors took to stop or reverse the internal bleed because Mr. Molinaro's condition had deteriorated so significantly. Three liters of blood that had been crushing Mr. Molinaro's lungs were eventually removed from his chest. Mr. Molinaro died due to complications stemming from the internal bleeding.

Plaintiff presented expert medical testimony that Nurse Kunz violated the standard of care by failing to monitor the patient, to take and document repeat vital signs and report Mr. Molinaro's respiratory and pulse-oxygenation problems to a physician, and that the delayed diagnosis of Mr. Molinaro's chest bleed was a legal cause of his death. The jury found that Nurse Kunz was negligent and the legal cause of Mr. Molinaro's death, and awarded damages. Defendant Methodist Hospital now appeals the jury's findings and damages award, some of this court's evidentiary rulings and the award of delay damages.

## II. PROCEDURAL HISTORY

Plaintiff Rita Molinaro, individually and as administratrix of the estate of Ralph Molinaro, her husband, commenced this medical malpractice action on January 21, 2003, and asserted claims for wrongful death and

survival damages against defendants Edward J. Ramoska M.D. and Methodist Hospital, alleging that defendants' actions were negligent and resulted in the death of plaintiff's decedent, Ralph Molinaro.

The case was tried before this court from August 1 through August 8, 2005. The jury found that Dr. Ramoska was not negligent but that Methodist Hospital, through its employee Steven Kunz R.N., was negligent and the legal cause of Mr. Molinaro's death. The jury awarded damages under the Wrongful Death Act totaling $430,529.35 (funeral expenses of $6,867, medical expenses of $348,662.35, and future noneconomic losses of $75,000) and damages under the Survival Act totaling $153,256 (past loss of net earning capacity of $39,133, future loss of net earning capacity of $39,123 and past noneconomic loss of $75,000), for a total award of $583,785.35. On August 16, 2005, plaintiff filed a petition for delay damages in the amount of $48,158.64, bringing the total amount to $631,943.99.[1]

This court granted plaintiff's petition for delay damages on December 14, 2005, and denied defendant's motion for post-trial relief on the same date. Defendant filed this timely appeal.

### III. FACTUAL BACKGROUND

Plaintiff's decedent, Ralph Molinaro, was an 80-year-old retired sheet metal worker who had been married to

---

1. As explained below, this court believes that the total amount of the damages (including delay damages) should be reduced to reflect the jury's failure to account for maintenance expenses in awarding damages.

plaintiff Rita Molinaro for over 55 years.[2] (N.T. at 317.) On the evening of January 21, 2001, Mr. Molinaro fell down the steps at his home and hit his head on the television. (N.T. at 327, 376.) Mr. Molinaro was transported by ambulance (with Mrs. Molinaro accompanying him) to Methodist Hospital and arrived at the emergency room at 10:40 p.m. (Exhibit P-1, "Emergency dept. nurses notes" at 5.)

Upon being admitted to the ER, Nurse Steven Kunz,[3] one of the ER nurses on duty, was assigned Mr. Molinaro as a patient and was responsible for his nursing care until Mr. Molinaro was transferred out of the ER at 7:30 a.m. the following morning. (Kunz dep. tr. at 46, 60-61.) According to Mrs. Molinaro, Mr. Molinaro vomited bright red blood as soon as he arrived in the exam room. (N.T. at 328-29.)

Nurse Kunz assessed and took a history from Mr. Molinaro. (Kunz dep. tr. at 27-28.) Nurse Kunz noted that Mr. Molinaro had an abrasion on his head and on his chin, and that he complained of back and neck pain. (Kunz dep. tr. at 30, 35.) Nurse Kunz also documented that Mr. Molinaro had a pacemaker, two heart valve replacements and was on four different medications, including Coumadin. (Exhibit P-1, "Emergency dept. nurses notes" at 5.) Coumadin is a blood-thinning medication that prevents the blood from clotting as quickly,

---

2. Mrs. Molinaro testified that Mr. Molinaro regularly did numerous household chores. As Mrs. Molinaro did not drive, he drove the two of them everywhere. (N.T. at 318, 337.)

3. Nurse Kunz testified that he documents everything that is done when he evaluates a patient. (Kunz dep. tr. at p. 24.) Consequently, if there is no documentation by Nurse Kunz of vital signs or measuring of pulse oxygenation, it is assumed that he did not do them.

a process known as anticoagulation, and can present a risk of excessive internal bleeding if a patient taking it falls. (N.T. at 385-87.)

According to Dr. Edward Ramoska, when a patient has internal bleeding the patient's pulse will increase, there will be a drop in blood pressure and shortness of breath, and there will be problems with oxygen saturation in the blood. (N.T. at 391-93.) Taking vital signs includes checking a patient's blood pressure, pulse and respiration rate, and is one way of assessing whether there are signs of an internal bleed. (N.T. at 391-93; Weihl dep. tr. at 101.) Methodist Hospital Emergency Room procedure required that Nurse Kunz check Mr. Molinaro's vital signs every two hours. (Kunz dep. tr. at 57.) Measuring a patient's pulse oxygenation (pulse ox), which is the level of oxygen saturation in the blood, is another way of checking for signs of an internal bleed. (N.T. at 391-93.) A low blood hemoglobin level is another indicator of an internal bleed. (Rumbak dep. tr. at 68, 70.)

Time is of the essence in reacting to a patient's internal bleeding which is a life-threatening emergency condition. (Rumbak dep. tr. at 54, 79-81; Weihl dep. tr. at 62, 64; N.T. at 542-43.) Dr. Rumbak testified that the anticoagulation effects of Coumadin could be reversed and bleeding stopped within a couple of hours. (Rumbak dep. tr. at 80-81.) The sooner the anticoagulation efforts are started, the better the likelihood of successfully stopping or mitigating the patient's bleed. (Rumbak dep. tr. at 79; Weihl dep. tr. at 62.) Thus, as soon as a patient on Coumadin is diagnosed with internal bleeding, steps must be taken immediately to minimize or stop the damage and increase the likelihood of surviving this dangerous

condition. (Rumbak dep. tr. at 54, 79-81; Weihl dep. tr. at 62, 64; N.T. at 542-43.)

Shortly after admission at about 10:40 p.m., Nurse Kunz took Mr. Molinaro's vital signs, which initially appeared to be normal. (Exhibit P-1, "Emergency dept. nurses notes" at 5; Kunz dep. tr. at 26-27, 63, 66.) Nurse Kunz then put Mr. Molinaro on a heart monitor and measured his pulse ox. (Kunz dep. tr. at 36.) Mr. Molinaro's pulse ox was 94 percent. (Kunz dep. tr. at 36.) This pulse ox was at the low end of an acceptable level. (Weihl dep. tr. at 81.) In spite of this pulse ox measurement, there is no evidence that Nurse Kunz ever retested Mr. Molinaro's pulse ox for the remainder of his shift. (Kunz dep. tr. at 63-64, 68, 99; exhibit P-1, "Emergency dept. nurses notes" at 7.)

Dr. Edward Ramoska, the head physician on duty in the ER, then examined Mr. Molinaro and ordered a number of tests, including x-rays of his spine and a CAT scan of his head. (N.T. at 382, 386-87.) Dr. Ramoska stated that he did not suspect that Mr. Molinaro had a chest bleed in part because his vital signs were normal. (N.T. at 404-405.) Dr. Ramoska testified that he initially believed there was nothing seriously wrong with Mr. Molinaro after viewing the test results. (N.T. at 393-94.) Dr. Ramoska did not learn that Mr. Molinaro was on Coumadin until almost an hour after Mr. Molinaro's arrival in the ER. (N.T. at 385-86.)

Dr. Ramoska instructed Nurse Kunz to see if Mr. Molinaro could move around so they could determine whether discharge was appropriate. (N.T. at 393-96.) At 2 a.m., Nurse Kunz got Mr. Molinaro up and "ambulating" but Mr. Molinaro became dizzy. (Kunz dep. tr. at

66.) Nurse Kunz testified that he informed Dr. Ramoska of this new symptom. (Kunz dep. tr. at 66.)

Dizziness can be a sign of decrease in oxygen saturation in the blood. Nevertheless, Nurse Kunz did not measure Mr. Molinaro's pulse ox at this time. (Kunz dep. tr. at 66-67.) Nurse Kunz did not take Mr. Molinaro's vital signs after Mr. Molinaro became dizzy, despite the fact that it had been two hours since he last took them. (Kunz dep. tr. at 63, 66-67.) In fact, Nurse Kunz took Mr. Molinaro's vital signs only 3 times, 10:40 p.m., 12 a.m. and 3:30 a.m., during the nearly nine hours that Mr. Molinaro was under Nurse Kunz' care in spite of the ER requirement of taking vital signs every two hours. (Exhibit P-1, "Emergency dept. nurses notes" at 5; Kunz dep. tr. at 26-27, 63, 66.)

Mrs. Molinaro, who had returned home, testified that she was awakened around 3 a.m. by a telephone call from Nurse Kunz. She testified that Nurse Kunz told her that Mr. Molinaro was fine and that she should come and get him. (N.T. at 331.) When Mrs. Molinaro told Nurse Kunz that she did not drive, Nurse Kunz told her that he could wrap Mr. Molinaro in some blankets and put him in a cab. (N.T. at 331.) Mrs. Molinaro responded by saying, "Don't you dare move him," and had a neighbor drive her to the hospital. (N.T. at 331-32.)

Mrs. Molinaro further testified that when she arrived, she found Mr. Molinaro sitting in a wheelchair. Upon seeing her he said, "Babe, I'm so sick. I don't want to go home. They want to send me home." (N.T. at 332.) Mrs. Molinaro testified that she did not want Mr. Molinaro sent home based on how he was doing and she demanded that Dr. Ramoska call Mr. Molinaro's physi-

cian, Dr. DePace. (N.T. at 332; Nurse Kunz dep. tr. at 69-70, 72.)

Dr. Ramoska testified that around 3:30 a.m. he spoke to Drs. DePace and Alloy who were Mr. Molinaro's cardiologist and primary care physicians, respectively. Dr. Alloy agreed to admit Mr. Molinaro as his patient. (N.T. at 396-98.) Dr. Ramoska believed that he was no longer the physician responsible for Mr. Molinaro's care after this time. (N.T. at 419-20.) Nurse Kunz took Mr. Molinaro's vital signs at 3:30 a.m., and then failed to do so again for the remainder of his shift. (Kunz dep. tr. at 66, 92, 99.)

At 4 a.m., Mr. Molinaro's blood work testing showed abnormal results and indicated that he had a bleed. (Weihl dep. tr. at 56-57; Rumbak dep. tr. at 68, 70.) Nurse Kunz admitted that this is information he should have reported to a doctor but there is no evidence that Nurse Kunz verbally reported these abnormal blood testing results to Dr. Ramoska or to any physician. (Weihl dep. tr. at 56-57, 116-17; Kunz dep. tr. at 81, 86.)

For the next several hours, Mr. Molinaro remained in the emergency room while waiting for a bed in another unit. (Kunz dep. tr. at 90-92.) At 5 a.m., Nurse Kunz "reassessed" Mr. Molinaro but did not take his vital signs.[4] (Kunz dep. tr. at 92.)

At 6 a.m. Mr. Molinaro's condition worsened: one of the other ER nurses measured Mr. Molinaro's pulse ox, and noticed it had dropped to 85 percent, and that his

4. At 5:25 a.m., the house doctor, Dr. Daniels, examined Mr. Molinaro and took his vital signs as a prerequisite to assigning him to a bed in another unit. However, Mr. Molinaro remained in the ER after Dr. Daniels finished the examination. (Weihl dep. tr. at 117-18.)

respirations had increased from 24 (at the time of his arrival) to 32. (Kunz dep. tr. at 92-94; Weihl dep. tr. at 58.) It was undisputed that both measurements were abnormal. (Kunz dep. tr. at 92.) The ER nurse then administered oxygen and Lasix, and Mr. Molinaro's pulse ox increased to 94 percent. (Kunz dep. tr. at 93-94; Weihl dep. tr. at 58.) However, neither Nurse Kunz nor anyone else informed a physician about this drop in Mr. Molinaro's pulse ox and increased respiration rate. (Kunz dep. tr. at 102-104.) Plaintiff's expert, Dr. Weihl, testified that this was a breach of the standard of nursing care. (Weihl dep. tr. at 57.)

Despite this alarming change in Mr. Molinaro's condition, Nurse Kunz did not perform a follow-up pulse ox, did not repeat vital signs and did not reevaluate Mr. Molinaro's chest before his shift ended at 7:30 a.m. (Kunz dep. tr. at 96, 99, 102.) Plaintiff's expert, Dr. Weihl, testified that these failures were also a breach of the standard of nursing care. (Kunz dep. tr. at 59-61.) When Nurse Kunz left his shift, he simply noted on Mr. Molinaro's chart that he "was oriented to time and place." (N.T. at 108.)

Plaintiff's experts, Drs. Weihl and Rumbak, testified to a reasonable degree of medical certainty that Mr. Molinaro's symptoms and tests revealed that Mr. Molinaro was bleeding into his chest (specifically into his mediastinum) in the early morning hours of January 22, 2003. (Weihl dep. tr. at 61; Rumbak dep. tr. at 23-24.) However, because Nurse Kunz did not inform physicians of the abnormal blood results, the drop in the pulse ox and the increased respiration rate and did not reassess Mr. Molinaro's chest, or do repeat vital signs, the diagnosis of chest bleeding was not made. Therefore, efforts to re-

duce or stop the bleed were not made at this time in spite of Mr. Molinaro's symptoms of internal bleeding. (Weihl dep. tr. at 61-64; Rumbak dep. tr. at 22, 26, 34, 70.)

At 7:50 a.m. Mr. Molinaro's condition continued to decline. His respiration rate again increased. (Weihl dep. tr. at 126.) He experienced increasing difficulty breathing and was eventually placed on a respirator. (Rumbak dep. tr. at 20.) By about 8 a.m., when Mr. Molinaro's physicians were finally informed of his symptoms and test results, they diagnosed an internal bleed. They began to reverse the anticoagulation process caused by the Coumadin. (Weihl dep. tr. at 62-64.)

Unfortunately, by this time Mr. Molinaro had deteriorated so significantly, and there was so much blood in his chest and in or around his lungs, that he went into respiratory failure. (Rumbak dep. tr. at 34.) On January 25, 2001, surgeons removed three liters of blood from Mr. Molinaro's chest cavity. (Weihl dep. tr. at 61-62; Rumbak dep. tr. at 26-28.) Plaintiff's expert, Dr. Rumbak, testified that Mr. Molinaro had been bleeding for several days, and that the blood had been compressing his lungs. (Rumbak dep. tr. at 29-30, 34.)

Following the surgery Mr. Molinaro needed long-term mechanical breathing assistance receiving oxygen through a tube inserted in his throat. (Rumbak dep. tr. at 30, 34.) According to Dr. Rumbak, the ventilation tube kept Mr. Molinaro from speaking and caused him a lot of pain for the several weeks it was there. (Rumbak dep. tr. at 30-31.) He also had a feeding tube inserted through his nose. Dr. Rumbak also noted that Mr. Molinaro remained aware of what was going on during that time period. (Rumbak dep. tr. at 32-33.) According to Mrs.

Molinaro, "he looked terrible. His face was all red. His neck was swollen." (N.T. at 334.) Mrs. Molinaro testified that her husband looked like he was angry and in pain. She asked him to tell her if he was in pain by blinking twice for yes, and she stated that he then blinked twice. (N.T. at 335.) Due to complications stemming from the internal bleeding, Mr. Molinaro was never able to breath on his own again and his family decided to have him removed from life-support, which was done on February 22, 2001. (Rumbak dep. tr. at 33-34.) He was placed on a morphine drip and passed away on March 9, 2001. (Rumbak dep. tr. at 33-34.)

It was undisputed that Mr. Molinaro's death related to complications stemming from the internal bleeding in his chest. (N.T. at 61.)

## IV. LEGAL DISCUSSION

Defendants assert 14 instances of error that they contend entitle them to judgment n.o.v., a new trial or remittitur. However, as many of the grounds asserted are either quite broad or repetitive, for purposes of this opinion this court has condensed these allegations of error into six substantive points. This court will address them in the following order:

(A) The plaintiff established a prima facie case against Nurse Kunz, and the jury's verdict against him was supported by—and consistent with—the evidence. (See defendant's statement of matters complained of on appeal, numbers one, two, three, five, six and seven);[5]

---

5. Defendant's first three allegations of error assert globally that this court erred by not granting judgment n.o.v., a new trial or remittitur (point one), that the verdict was against the weight of the evidence

(B) This court properly prohibited defense counsel from asking plaintiff's expert witness, Dr. Albert Weihl, questions about his annual income which were irrelevant and more prejudicial than probative. (See defendant's statement of matters complained of on appeal, numbers eight and nine);[6]

(C) This court properly allowed two of plaintiff's expert witnesses, Dr. Weihl and Dr. Vogel, to testify within the fair scope of their reports. See defendant's statement of matters complained of on appeal, numbers 10 and 11);[7]

(D) This court properly refused to grant a mistrial after plaintiff's counsel mentioned the existence of a lien where defense counsel stipulated to the existence of the lien and suffered no prejudice, and the court cured any potential confusion with a curative instruction. (See

---

(point two), and that defendant's motion for nonsuit and motion for directed verdict should have been granted (point three). Defendant's point five states that plaintiff failed to set forth a prima facie case against Nurse Kunz, point six states that the jury's conclusions regarding Nurse Kunz were against the weight of the evidence, and point seven states that the verdict against Nurse Kunz was "irreconcilably inconsistent" with the verdict of no liability for Dr. Ramoska.

6. Defendant's point eight states that this court erroneously "barred" evidence that plaintiff's expert, Dr. Weihl, earned $125,000 per year reviewing medical malpractice cases primarily for plaintiffs, and point nine states that plaintiff waived any future objections by objecting to the questions about Dr. Weihl's income in a motion in limine instead of during the videotaped testimony.

7. Defendant's point 10 states that this court allowed Dr. Weihl to testify beyond the fair scope of his report, and point 11 states that this court similarly allowed plaintiff's expert, Dr. Vogal, to testify beyond the fair scope of his report.

defendant's statement of matters complained of on appeal, number 12);[8]

(E) With the exception of the damages for lost earning capacity, the amount of the verdict was consistent with the evidence produced at trial, and was neither shocking nor excessive. The court does agree with the defendant's contention that the award for damages to past and future earning capacity should be molded to reflect reasonable maintenance expenses. (See defendant's statement of matters complained of on appeal, numbers four and 13);[9]

(F) This court properly granted plaintiff's petition for delay damages. (See defendant's statement of matters complained of on appeal, number 14).[10]

The requested remedy for the first four categories of error set forth above is either judgment n.o.v. or a new trial. The standards of review for both remedies are well-settled under Pennsylvania law. A trial court should grant a judgment n.o.v. if it determines that the evidence was "wholly insufficient" to support a logical conclusion of negligence. *Reichman v. Wallach,* 306 Pa. Super. 177, 189, 452 A.2d 501, 507 (1982). In *Moure v. Raeuchle,* 529 Pa. 394, 604 A.2d 1003 (1992), the Pennsylvania

---

8. Defendant's point 12 states that plaintiff's counsel's reference to a "monetary 'lien' that was 'due' to an insurance carrier, which will 'get that money back'" was grounds for a mistrial.

9. Defendant's point four states that defendant is entitled to a new trial or to remittitur because the amount of the verdict was "excessive, shocking and against the weight of the evidence," and point 13 states that the award for lost earnings should be molded or reduced to reflect the personal maintenance reduction testified to by plaintiff's expert, David Hopkins.

10. Defendant's point 14 states that this court erred by granting plaintiff's motion for delay damages (as well as denying defendant's motion for post-trial relief).

Supreme Court explained the limited circumstances where a judgment n.o.v. is warranted: "There are two bases upon which a judgment n.o.v. can be entered: one, the movant is entitled to judgment as a matter of law, and/or two, the evidence was such that no two reasonable minds could disagree that the outcome should have been rendered in favor of the movant." *Id.* at 402, 604 A.2d at 1007. (internal citations omitted)

The Superior Court has addressed the standard of review applied to a trial court's decision to grant judgment n.o.v.:

"When reviewing a trial court's denial of a motion for judgment n.o.v., we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict... Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact... A judgment n.o.v. should be entered only in a clear case. Our review of the trial court's denial of a new trial is limited to determining whether the trial court acted capriciously, abused its discretion, or committed an error of law that controlled the outcome of the case. In making this determination, we must consider whether, viewing the evidence in the light most favorable to the verdict winner, a new trial would produce a different verdict. Consequently, if there is any support in the record for the trial court's decision to deny a new trial, that decision must be affirmed." *Parker v. Freilich,* 803 A.2d 738, 744 (Pa. Super. 2002).

The Supreme Court has held that a trial court has broad discretion to grant or deny a new trial. *Harman ex rel.*

*Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116, 1121 (2000). The *Harman* court further noted:

"The grant of a new trial is an effective instrumentality for seeking and achieving justice in those instances where the original trial, because of taint, unfairness or error, produces something other than a just and fair result, which, after all, is the primary goal of all legal proceedings. Although all new trial orders are subject to appellate review, it is well-established law that, absent a clear abuse of discretion by the trial court, appellate courts must not interfere with the trial court's authority to grant or deny a new trial." 756 A.2d at 1121-22.

### A. *The Plaintiff Established a Prima Facie Case of Professional Negligence Against Nurse Kunz, and the Jury's Verdict Against Him Was Supported by—and Consistent With—the Evidence*

Plaintiff established a case of professional negligence against Nurse Kunz through competent expert medical testimony and admissions of defendant Kunz. Defendant Kunz breached the standard of nursing care, his breach increased the risk of harm to Mr. Molinaro by delaying the diagnosis of an internal bleed, and caused his death from complications related to the internal bleeding.

In order for a plaintiff to establish a prima facie case of medical negligence, the plaintiff must produce expert testimony that the defendant physician breached the standard of care, and that the breach was the legal cause of the harm suffered. *Mitzelfelt v. Kamrin,* 526 Pa. 54, 62, 584 A.2d 888, 892 (1990). This case belongs to that group of medical negligence cases where the plaintiff must present expert medical testimony that the negligent

acts of the defendant increased the risk of harm to the patient, and that the patient sustained the harm. The Supreme Court set forth these requirements in *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978):

"Once a plaintiff has introduced evidence that a defendant's negligent act or omission increased the risk of harm to a person in the plaintiff's position, and that the harm was in fact sustained, it becomes a question for the jury as to whether or not that increased risk was a substantial factor in producing the harm." *Id.* at 269, 392 A.2d at 1286.

### (1) Nurse Kunz Breached the Nursing Standard of Care

Plaintiff presented evidence that defendant Kunz breached the standard of nursing care by failing to monitor Mr. Molinaro, failing to take and document repeat vital signs and pulse ox measurements and patient assessments, and failing to report abnormal findings to a physician. No defense expert rebutted this evidence that Nurse Kunz was negligent.

Nurse Kunz admitted that Mr. Molinaro was assigned to him and that Mr. Molinaro remained his patient for the duration of Nurse Kunz' shift until 7:30 a.m. on January 22. (Kunz dep. tr. at 46, 60.) Therefore, Nurse Kunz was legally responsible for monitoring, assessing and communicating abnormal results to physicians as required by the nursing standard of care.

Since Mr. Molinaro had fallen and was taking the blood thinning drug Coumadin he was at high risk for uncontrolled internal bleeding. Vital signs, pulse ox measurements and blood results could show signs that there was

an internal bleed or cardiac problems. If there was an internal bleed, Mr. Molinaro's pulse would increase, his blood pressure would drop, he would have shortness of breath and have decreased oxygen saturation in the blood. (N.T. at 391-93.) Low hemoglobin levels are also signs of bleeding. (Rumbak dep. tr. at 68, 70.)

Nurse Kunz failed to take measurements throughout his shift that would show doctors signs of an internal bleed. Nurse Kunz did not take and document repeat vital signs every two hours as required, and did not do a repeat pulse ox even though initial readings were on the low end of normal. Since many measurements were not taken, it is difficult to know when the bleed would have been diagnosed if such tests were done as required.

When Mr. Molinaro's blood results showed there was abnormally low hemoglobin levels at 4 a.m., Nurse Kunz did not verbally communicate this signal of an internal bleed to any physician. Dr. Rumbak testified that Mr. Molinaro's hemoglobin level of "12.6 is a bleed." (Rumbak dep. tr. at 70.) Dr. Rumbak said that for a patient on Coumadin who just suffered a fall, a 12.6 level would cause concern since it is "obviously low." (Rumbak dep. tr. at 70.) Even though time is critical to success in stopping or mitigating a bleed, Nurse Kunz did not verbally tell any physician of this immediate worrisome sign.

When there were significant signs of dangerous internal bleeding at 6 a.m. on January 22, 2001, Nurse Kunz again failed in his responsibilities. Mr. Molinaro's pulse ox measured abnormally low at 85 percent and his breathing was abnormal with respirations of 32 per minute. (Kunz dep. tr. at 93.) Although Mr. Molinaro was then given Lasix and oxygen, Nurse Kunz admits that he

should have been evaluating Mr. Molinaro's chest once Mr. Molinaro's pulse ox dropped to 85 percent. (Kunz dep. tr. at 99.)

Nurse Kunz further testified that when a patient has trouble breathing, he is supposed to "listen to their lungs, look for edema . . . [and do a] pulse ox." (Kunz dep. tr. at 24.) Nurse Kunz did not do a repeat pulse ox or reassess vital assigns after these danger signs appeared. (Kunz dep. tr. at 93, 108-109.) Most significantly, Nurse Kunz failed to alert any physicians of this critical downturn in Mr. Molinaro's condition. Nurse Kunz simply noted in the chart as he ended his shift at 7:30 a.m. that Mr. Molinaro was oriented to time and place.

Plaintiff's expert, Dr. Albert Weihl, discussed the importance of a nursing response to the change in Mr. Molinaro's drop in pulse ox to 85 percent at 6 a.m. "This is a significant change, a significant and worrisome abnormality that requires; number one, notification of a physician and appropriate attention addressed to this problem." (Weihl dep. tr. at 58.) Dr. Weihl said the nursing standard of care mandated that Mr. Molinaro's condition required nursing reassessment and a repeat pulse ox and immediate notification of a physician. (Weihl dep. tr. at 58-59.)

Dr. Weihl testified that Nurse Kunz' care fell below the standard of care:

"Plaintiff's counsel: Okay, doctor, do you have an opinion with a reasonable degree of medical certainty as to whether the monitoring of Mr. Molinaro by the emergency room nurses was below the standard of care?

"Dr. Weihl: I do.

"Plaintiff's counsel: And what is that opinion?

"Dr. Weihl: My opinion is that the patient did not have documented repeat vital signs, and when he had significant abnormalities at 6 in the morning of his oxygenation, no appropriate actions were taken, and no physician appears to have been informed of these abnormalities." (Weihl dep. tr. at 57.)

### (2) Nurse Kunz' Breach of the Nursing Standard of Care Was a Legal Cause of Mr. Molinaro's Death

Defendant claims that there was insufficient proof that Nurse Kunz' negligence delayed the diagnosis of an internal bleed and increased Mr. Molinaro's risk of dying from an internal bleed. To the contrary, there was significant uncontradicted evidence supporting plaintiff's claim that Nurse Kunz increased the risk of harm to Mr. Molinaro. There was unrebutted evidence of negligence that resulted in delayed diagnosis of an internal bleed and delayed steps taken to stop or mitigate the bleed. There was unrebutted evidence of causation that Mr. Molinaro died as a result of complications relating to the bleed. Thus, the only contested issue was whether if Nurse Kunz had done his job correctly, would Mr. Molinaro's bleed have been diagnosed early enough to have increased his chances of surviving. There was sufficient evidence presented to enable a jury to conclude that the delayed diagnosis decreased Mr. Molinaro's chances of survival.

It was undisputed that time is of the essence in the treatment of an internal bleed for a person on Coumadin. The sooner a bleed is identified, the sooner steps can be taken to stop the bleed and or to reverse the anticoagula-

tion process. Dr. Rumbak said, the anticoagulation effects of Coumadin could be reversed "in a fairly brief period of time." "Within a couple of hours, you can totally have stopped the bleeding. . . ." (Rumbak dep. tr. at 79-80.) Nevertheless, internal bleeding was not diagnosed in Mr. Molinaro until 8 a.m. on January 22, over nine hours after his admission to the ER. By then Mr. Molinaro's physical condition had significantly deteriorated. Even though steps were then immediately taken to remedy the internal bleeding, when Mr. Molinaro was operated on over three liters of blood were found and removed from Mr. Molinaro's chest permitting a jury to conclude that the bleeding had been going on for some time. It was undisputed that Mr. Molinaro died due to complications from the internal bleed.

It was also not disputed that vital signs and pulse ox measurements can show signs of internal bleeding. Low hemoglobin levels in the blood can suggest a bleed. By Nurse Kunz' own admission, he failed to take many steps—repeat vital signs, pulse ox and patient assessments—that would have signaled a bleed. He also failed to communicate abnormal findings that are signals of a bleed like low pulse ox and abnormal blood results to a doctor even though this was his responsibility.

Dr. Ramoska stated that he did not suspect that Mr. Molinaro had a chest bleed in part because his vital signs were normal. (N.T. at 404-405.) Even though Mr. Molinaro's first pulse ox at 10:40 p.m. was on the low side of normal, Nurse Kunz never took his pulse ox again. Likewise, after Mr. Molinaro was dizzy, Nurse Kunz did not repeat vitals as required until later. Blood results at 4 a.m. showing anemia and a bleed, according to Dr. Wiehl, but Nurse Kunz did not alert a doctor.

By 6 a.m., Mr. Molinaro showed dangerous signs of an internal bleed with his decreased pulse ox and increased respiration, but Nurse Kunz did not tell a physician or do repeat assessments. Doctors did not learn of the signs until 8 a.m., delaying the response time by at least two hours. Since Nurse Kunz failed to take these assessments as required and communicate the abnormal blood results at 4 a.m., signs of the internal bleed may have been identified much earlier than 6 a.m. and steps taken to stop or mitigate the internal bleeding initiated even earlier.

Specifically, Dr. Weihl stated that the change in Mr. Molinaro's low pulse ox at 6 a.m. signaled that there was "either a cardiac, respiratory or a combination of those two problems going on." (Weihl dep. tr. at 60.) Dr. Weihl explained that "[t]his requires nursing reassessment. It requires the patient be brought to the attention of the physician. It requires physician reassessment and it requires investigation to find out the cause and to correct the problem." (Weihl dep. tr. at 60.)

Since Nurse Kunz did not bring this change in oxygenation status to any physician's attention at the time that it occurred, no physician could have then used this information to diagnose the cardiac or respiratory problems (or combination of the two) from which Mr. Molinaro suffered stemming from the internal bleeding. Dr. Weihl testified that the proper diagnosis was: "a traumatic fall with intrathoracic bleeding that continued through the night in the setting of a patient who did not have normal ability to have his blood clot. So the diagnosis of intrathoracic or chest bleeding could and should have been made, and appropriate measures could and

should have been taken to reduce or stop that bleeding." (Weihl dep. tr. at 61.)

According to Dr. Weihl, the internal bleeding into the chest is an "emergency" and the proper steps should be taken immediately:

"The first thing that should have been done was to get the appropriate specialist at his bedside immediately. Once that was done, measures should have been undertaken to further diagnose the condition which would have been through ordering a CAT scan, which was ultimately done later on in the morning, and to administer medications and treatments to correct the thin blood or anti-coagulation to stop the bleeding, which also was done later on the 22nd."

He explained how this could be done:

"There are two ways that can be routinely given. One would be to give vitamin K, which might not have been given for various reasons, but the way that would have been perfectly and reasonably appropriate would have been to administer something called fresh, frozen plasma, which is blood plasma that contains clotting factors that Mr. Molinaro was lacking because of his Coumadin treatment. . . . So administering fresh, frozen plasma in measured amounts and monitoring the effect on the patients prothrombin time, PT or INR, would have been the way to correct his anticoagulated status." (Weihl dep. tr. at 61-62.)

Dr. Wiehl made clear that had these measures been undertaken earlier, Mr. Molinaro's condition likely would not have worsened to the state that ultimately led to his death. The following testimony by Dr. Wiehl emphasized

the critical factor of timing in initiating steps to stop the bleed:

"Plaintiff's counsel: When should that have been started?

"Dr. Wiehl: That should have been started as soon as a recognition of ongoing bleeding occurred which could and should have happened shortly after midnight on the 21st of January. . . .

"Plaintiff's counsel: Can you still stop the Coumadin?

"Dr. Wiehl: Yes. When you have a life-threatening event where the patient is literally bleeding to death, which is essentially what was happening, you have to stop the Coumadin. You have to do what we call reverse it and stop the bleeding.

"Plaintiff's counsel: Was this eventually—did they eventually do this?

"Dr. Wiehl: Yes. If we review the records of his blood tests from the 22nd, by the afternoon, evening of the 22nd they had reversed his INR from 3.6 down to 1.8 and down to 1.4, so that is exactly what was done over the course of the 12 hours or so from 8 in the morning until 8 in the evening but should and could have been done in the 12 hours before 8 in the morning.

"Plaintiff's counsel: Do you have an opinion with a reasonable degree of medical certainty if Mr. Molinaro would have been properly diagnosed in the early hours of January 22 and his anticoagulated state reversed, would Mr. Molinaro's condition have deteriorated?

"Dr. Wiehl: It would not have deteriorated and certainly would not have deteriorated to the magnitude

ending up as a catastrophic condition later on in the morning of January 22.

"Plaintiff's counsel: Can you go into a little greater detail:

"Dr. Wiehl: If the bleeding had stopped or been stopped, Mr. Molinaro would not have progressed to the condition that he was where he essentially was no longer breathing and had to be placed on a breathing machine later on in the morning, after 8 in the morning on the 22nd. *Had the bleeding been controlled in the preceding eight hours, it is unlikely that he would have progressed to that condition and required the treatment and intensive care unit that he required later that day.*" (Weihl dep. tr. at 62-64.) (emphasis added)

Dr. Rumbak reiterated that taking these steps earlier could have stopped Mr. Molinaro's bleeding within a couple of hours. (Rumbak dep. tr. at 79-80.) Instead, Mr. Molinaro suffered from three liters of blood from internal bleeding compressing his lungs and never fully recovered.

Dr. Weihl was unequivocal on the issue of causation: If Nurse Kunz had made proper assessments as required after midnight on January 22, the bleed would have been detected and controlled earlier making it unlikely that Mr. Molinaro would have deteriorated to a point from which he could not recover. Dr. Weihl concluded:

"Mr. Molinaro spent over two months in the intensive care until, and *ultimately died,* sometime in March of 2001 *as a direct result of his injury and treatment or lack of treatment* thereof." (Weihl dep. tr. at 64.) (emphasis added)

Thus, a jury could have found that Nurse Kunz' lack of treatment increased Mr. Molinaro's risk of dying from the bleed. There was sufficient evidence presented by plaintiff's experts to make the causal connection[11] required by the law.

### (3) The Jury's Finding That Nurse Kunz Was Liable for Breaching the Nursing Standard of Care But That Dr. Edward Ramoska Complied With the Physician's Standard of Care Is Reasonable

It was undisputed that Nurse Kunz was required to comply with the standard of care for nurses whereas Dr. Ramoska was bound by a physician's standard of care, and that these two standards were distinct. (N.T. at 577-84.) Certainly a jury could reasonably conclude that the nurse did not comply with his responsibilities but the

---

11. Counsel agreed that the jury be instructed as follows on causation: When a defendant-physician and/or nurse negligently fails to act, or negligently delays in employing indicated diagnostic or therapeutic measures, and the negligence is a legal cause of the injuries to the patient, the plaintiff does not have to prove to a certainty that proper care would have, as a medical fact, prevented the injuries in question. If a doctor or nurse's negligent action or inaction has effectively terminated the patient's chances of avoiding injuries, he may not raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of avoiding injuries, and the party has destroyed that possibility, he or she is liable to the plaintiff. A causal connection between the injuries suffered and the defendant's failure to exercise reasonable care may be proven by evidence that the risk of incurring those injuries was increased by the party's negligent conduct. The law recognizes that it is rarely possible to demonstrate to an absolute certainty what would have happened in circumstances that the wrongdoer did not allow to come to pass. (N.T. at 656-57; adapted from Pa. SSJI 10.03B.)

doctor did, and that the nurse's failure to do so led to the delay in diagnosing the bleed until it was too late to remedy it effectively. Moreover, the nurse was responsible for Mr. Molinaro's care until 7:30 a.m. whereas Dr. Ramoska's care ended at 4 a.m. (Kunz dep. tr. at 60; Weihl dep. tr. at 109.)

Dr. Ramoska and the other physicians are entitled to presume that nurses under their supervision are complying with their responsibilities to take and document certain patient assessments and to communicate abnormal findings to a physician. To assume otherwise would mean medical facilities could not operate in any efficient or effective manner while physicians had to recheck everything nurses are expected to do. The physicians rely on nurses to comply with their standard of care, so that physicians in turn can make appropriate diagnoses based on nursing assessments, measurements and reports of abnormal findings.

Indeed, in this case once doctors learned of Mr. Molinaro's low pulse ox and increased respirations they diagnosed the internal bleed and took requisite measures. If Nurse Kunz had taken required vital signs and other assessments throughout the night and reported abnormal findings, then Mr. Molinaro's diagnosis of an internal bleed may have been made even earlier. The verdict reflects that the jury believed that if Nurse Kunz had taken and communicated the information earlier, the diagnosis of the bleed would have been made earlier by either Dr. Ramoska or other physicians, and Mr. Molinaro's course would have been very different.

There was nothing inconsistent about the jury finding that Nurse Kunz was negligent and increased Mr. Mo-

linaro's risk of dying from a bleed and the finding that Dr. Ramoska was not negligent. It was reasonable for Dr. Ramoska to assume that Nurse Kunz was doing his job properly. Nurse Kunz' failure to take or communicate tests signaling a bleed, precluded Dr. Ramoska from knowing that there were danger signs. Moreover, Dr. Ramoska's responsibilities for Mr. Molinaro's care ended at 4 a.m. on January 22, whereas Nurse Kunz' responsibilities extended until 7:30 a.m. Before Dr. Ramoska's care ended, Nurse Kunz had not taken many of the requisite measurements so there was no information provided to Dr. Ramoska from which he could diagnose the bleeding. The danger signs in abnormal blood results, decreased pulse ox and increased respiration rates were discovered after Dr. Ramoska's care had ended. It was Nurse Kunz who delayed in communicating signs of a bleed to any physician so that the diagnosis could have been made.

**B.** *This Court Properly Prohibited Defense Counsel From Asking Plaintiff's Expert Witness, Dr. Albert Weihl, Questions About his Annual Income Which Were Irrelevant and More Prejudicial Than Probative*

Defendant claims this court erred by granting plaintiff's motion in limine and limiting defendant from questioning the plaintiff's medical expert, Dr. Weihl, about his personal income unrelated to the case. Defendant claims that the excluded testimony was relevant to credibility and bias and the jury's failure to learn that Dr. Weihl earned roughly $125,000 annually as an expert witness so prejudiced the defendant that it warrants a

new trial. This court precluded the testimony because it was irrelevant, cumulative and prejudicial.

This court allowed defendant the following line of questioning about the proportion of Dr. Weihl's income that came from work as an expert witness:

"Q: You also generate a significant portion of your income from this type of work, do you not?

"A: That's correct."

This court prohibited the defendant from going further by questioning Dr. Wiehl about the exact amount of annual income he derived from unrelated expert work:

"Q: In the neighborhood of $125,000 per year?

"A: Correct.

"Q: So you make $125,000 a year reviewing medical records and giving your opinions in medical malpractice cases?

"A: Correct." (Court's August 1, 2005 order granting in part and denying in part plaintiff's motion in limine.)

This court's order allowed defendant to meaningfully probe any interest Dr. Weihl might have in testifying while excluding highly prejudicial questions about Dr. Weihl's annual income not derived from this case. Defendant asked Dr. Weihl over 60 questions about his work as an expert witness. (Weihl dep. tr. at 130-40; pl.'s mem. of law in opp'n to def.'s mot. for post-trial relief at 22.) Defendant's questioning of Dr. Weihl revealed the total number of cases he had testified in over his career, the number of cases per year, that roughly 90 percent of that testimony was for plaintiffs' cases, his affiliation with

several expert witness locator services, the number of states in which he had testified, and that expert witness work is a significant portion of his income. These questions extensively addressed any bias or credibility that Dr. Wiehl might have as an expert. Having the jury learn the specific dollar amounts Dr. Weihl made in other unrelated cases would have been cumulative.

Pennsylvania Rule of Evidence 403 states that, "Although relevant, evidence may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." See also, *Daset Mining Co. v. Industrial Fuels Corp.,* 326 Pa. Super. 14, 22, 473 A.2d 584, 589 (1984). Pennsylvania courts have consistently held that a trial court has broad discretion regarding exclusion or inclusion of evidence. "Our standard of review for rulings on the exclusion of evidence is very narrow. An appellate court will reverse the ruling of the trial court only for an abuse of discretion or error of law." *Gemini Equipment Co. v. Pennsy Supply Inc.,* 407 Pa. Super. 404, 413, 595 A.2d 1211, 1215 (1991).

In addition to being cumulative, this court properly excluded questioning about Dr. Weihl's income from sources entirely unrelated to this case, because that information was too prejudicial. Pennsylvania courts have held that, while it is permissible to cross-examine an expert regarding financial compensation and other personal interests in that specific case, permissible cross-examination does not extend to the expert's financial compensation in wholly unrelated cases:

"We do not believe, however, that the case law in this jurisdiction would condone the type of extensive disclosure of an expert's fee generating cases, especially since they were not related to the case at bar (except tangentially) . . . . There must be, and is, a point beyond which inquiry is/will be held to be prejudicial, too intrusive and only serving to divert the case into collateral matters. The inquiry should not be allowed into these other cases . . . we do not think this encompasses the emptying of one's pockets and turning them inside out so that one's financial worth can be open to scrutiny." *Mohn v. Hahnemann Medical College and Hospital of Philadelphia,* 357 Pa. Super. 173, 179, 181, 515 A.2d 920, 923, 924 (1986). This court excluded specific numbers about Dr. Wiehl's annual income unrelated to the case at trial which is exactly the kind of prejudicial inquiry that the Superior Court held was inadmissible in *Mohn. Id.* at 181, 515 A.2d at 924-25. ("[T]he permissible bounds of assailing [credibility] were exceeded when the expert's total income, unrelated . . . to the results of the trial, was exposed to the jury.")

Defendant also claims that plaintiff waived any objection to the inquiry into Dr. Weihl's finances because plaintiff's counsel did not object to the questions during the videotaped trial testimony even though plaintiff raised the objection before trial. Defendant cites no case law explaining why this court should not have considered plaintiff's motion in limine and simply cites Pa.R.C.P. 4016 ("Taking of depositions. Objections") without further discussion. Rule 4016(b) provides that: "objections to the competency of a witness or to the competency, relevancy, or materiality of the testimony are not waived

by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which was known to the objecting party and which might have been obviated or removed if made at that time." Defendant never argued that, had the objection been made earlier, like an objection to form, the question would have been reworded to obviate the objection. Accordingly, Rule 4016 provides that plaintiff's objection was not waived and does not support defendant's argument.

In addition, Pennsylvania Rule of Civil Procedure 126 ("Liberal construction and application of rules") support this court's decision to grant plaintiff's motion in limine to preclude prejudicial and cumulative video-taped trial testimony prior to its being heard by the jury even though the objection was not made during the deposition. Pa.R.C.P. 126 grants courts significant discretion to enforce or disregard the rules of civil procedure when justice so requires and the substantial rights of the parties are not affected:

"The rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties." Pa.R.C.P. 126. "We are cognizant that at times the rigid application of our rules does not serve the intended purpose of justice and fairness, but rather results in a harsh or even unjust consequence. For this reason, we promulgated Pa.R.C.P. 126 wherein we granted to the trial court latitude to overlook any *procedural* defect which does not prejudice

430

the rights of a party." *Sahutsky v. H.H. Knoebel Sons,* 566 Pa. 593, 782 A.2d 996, 1001 (2001) (quoting *Kurtas v. Kurtas,* 521 Pa. 105, 109, 555 A.2d 804, 806 (1989). (emphasis in original)

Likewise, the Pennsylvania Rules of Evidence "shall be construed to secure fairness" with the goal that the "truth may be ascertained and proceedings justly determined." Pa.R.E. 102. The commentary to Rule 103 ("Rulings on evidence") explains the purpose of motions in limine:

"Motions in limine permit the trial court to make rulings on evidence prior to trial or at trial but before the evidence is offered. Such motions can expedite the trial and assist in producing just determinations. A ruling on a motion in limine on the record is sufficient to preserve the issue for appeal. . . ." Pa.R.E. 103 comt. at ¶2.

Defendant's position that plaintiff waived the objection puts form ahead of substance, an approach totally at odds with Pennsylvania Rules of Evidence and procedure. Substantive objections made during videotaped testimony must await a ruling by the trial court at a later date. A party lodges objections to questions during the video and the questioning continues. The trial court rules on the objection prior to trial. Sometimes the delay between the taped testimony and the court's decision can be several weeks or more. The court's deadline is to make the ruling before the jury hears the testimony.

In the current case, whether plaintiff's counsel had objected to improper questions about Dr. Weihl's finances during the video, or sometime before trial, would have had no effect on when this court actually considered the objection. Relying on Rule 126, this court views

plaintiff counsel's objection to the finance questions being raised in a motion in limine as opposed to an objection on the video as an "error or defect of procedure which does not affect the substantial rights of the parties." Plaintiff's motion in limine to the question was filed five days before trial giving defendant ample opportunity to argue its legal position before the court made its decision.

Finally, even if the testimony about Mr. Wiehl's expert income was admissible this court's preclusion of it would have been harmless error. "The harmless error doctrine underlies every decision to grant or deny a new trial . . . the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." *Harman ex rel. Harman v. Borah,* 562 Pa. 455, 467, 756 A.2d 1116, 1122 (2000). As noted above, defendant had sufficient opportunity to probe Dr. Weihl's credibility in front of the jury with the 60 other questions about his work as an expert witness. The exclusion of two additional questions did not affect the substantive rights of defendant in any way.

C. *This Court Properly Allowed Plaintiff's Expert Witnesses, Dr. Weihl and Dr. Vogel, To Testify Within the Fair Scope of Their Reports, an Issue Wholly Irrelevant to the Case Against Nurse Kunz*

The defendant contends that this court erred by permitting both plaintiff's experts, Dr. Weihl and Dr. Vogel, to testify outside the fair scope of their respective expert reports. The disputed testimony of both Drs. Weihl and Vogel was wholly irrelevant to the case against Nurse Kunz, but related only to the case against Dr. Ramoska

and whether he interpreted Mr. Molinaro's chest x-ray and CT scan correctly. The jury found Dr. Ramoska was not negligent and there has been no appeal relating to Dr. Ramoska. Plaintiff never claimed that Nurse Kunz failed to read or interpret a chest x-ray or CT scan but rather that Nurse Kunz failed to take and document vital signs and patient assessments, repeat pulse ox measurements and communicate abnormal findings to a physician. The portions of the Drs. Weihl and Vogel's testimony that defendants contend were outside the scope of their reports did not touch on the claims against Nurse Kunz in any way, so defendant suffered no prejudice. Moreover, defendant suffered no surprise from the testimony.

Pennsylvania law regarding a trial court's admission and exclusion of expert testimony evidence was summarized by the Superior Court in *Foflygen v. Allegheny General Hospital,* 723 A.2d 705 (Pa. Super. 1999):

"Rulings on the admission and exclusion of evidence are within the discretion of the trial judge and will not be reversed on appeal absent a manifest abuse of that discretion. The admission of expert testimony is a matter within the sound discretion of the trial court, and appellate review of the trial court's action is similarly and correspondingly limited. The decision of the trial judge on the question of the admissibility of expert testimony will not be reversed, remanded, overruled, or disturbed by an appellate court unless there was a clear abuse of discretion or a clear error. However, that discretion is not unlimited, and where the ruling of a trial court exceeds those limits and a party is prejudiced thereby reversible error occurs. . . . [I]n determining whether an expert's

trial testimony falls within the fair scope of his pretrial report, the trial court must determine whether the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness. The trial court must also inquire whether there has been surprise or prejudice to the party which is opposing the proffered testimony of the expert, based upon any alleged deviation between the matters disclosed during discovery, and the testimony of such expert at trial. What constitutes surprise and prejudice, however, depends upon the pretrial particulars of each case. . . . Where an expert's fact/opinion testimony is fair rebuttal to the other party's expert testimony, it cannot be seen as unfairly surprising or prejudicial." *Id.* at 709-10. In each case, "[t]he question to be answered is whether, . . . the discrepancy between the expert's pretrial report and his trial testimony is of a nature which would prevent the adversary from preparing a meaningful response, or which would mislead the adversary as to the nature of the appropriate response." See *Brainhauer v. Lehigh Valley Hospital,* 834 A.2d 1146, 1151 (Pa. Super. 2003). (internal citation omitted)

During Dr. Weihl's testimony, defendants objected only once that the testimony exceeded the fair scope of his expert report. The objection was when plaintiff's counsel asked Dr. Weihl whether he agreed with the defendants' expert Dr. Unger's assertion that in taking an x-ray "patient position makes the mediastinum looks [sic] falsely large." (Weihl dep. tr. at 47-48.) Dr. Weihl agreed with the general principle described by Dr. Unger. Dr. Weihl stated that although patient position can distort the size of the mediastinum on an x-ray, he did

not believe Mr. Molinaro's positioning had affected his chest x-ray. Dr. Weihl's testimony was no surprise and was simply responsive to Dr. Unger's report. Defendant can hardly claim to be surprised by discussion and substantial agreement to a point made by the defendant's own expert. Dr. Weihl's testimony was fair rebuttal to Dr. Unger's report. *Foflygen v. Allegheny General Hospital,* 723 A.2d at 710; see also, *Duttry v. Patterson,* 741 A.2d 199, 203 (Pa. Super. 1999) (rebuttal to opposing expert's testimony is not unfair surprise nor prejudicial).

Defendant concedes that plaintiff's expert Dr. Vogel had "no criticism of Nurse Kunz." Nevertheless, defendant argues that it was prejudiced by Dr. Vogel's testimony relating to Dr. Ramoska's care. (Mem. of law in supp. of def.'s mot. for post-trial relief at 2; supplemental mem. of law in supp. of def.'s mot. for post-trial relief at 8-11.) The testimony at issue did not relate to a contested issue involving Nurse Kunz or the cause of death.

Defendants' first objection related to this court's decision to allow Dr. Vogel to testify that the CT scan taken of Mr. Molinaro's head on January 22, 2001, showed no signs of his having suffered a "massive stroke." (N.T. at 154.) Plaintiff's proffered reason for the testimony was that defense counsel mentioned during his opening statement that Mr. Molinaro had suffered a massive stroke.[12]

---

12. Defense counsel said the reference to a massive stroke related to a stroke Mr. Molinaro allegedly suffered 10 years prior to the January 21, 2001 fall. Defendant simply contended that a stroke is one of the risks associated with taking a patient off of Coumadin and is related to issues surrounding Dr. Ramoska's care, but not Nurse Kunz' care. (N.T. at 160-61.)

(N.T. at 155-62.) Plaintiff's counsel was concerned that the defense opening might have led the jury to believe that Mr. Molinaro's death was caused by a stroke when he fell in January 21, 2001. Both parties agreed that Mr. Molinaro had not suffered a stroke on January 21, 2001, and that a stroke did not cause Mr. Molinaro's death. (N.T. at 157-59.) Defense counsel emphasized that whether or not Mr. Molinaro suffered an earlier stroke was not part of the defense. (N.T. at 160-61.) Thus, this court allowed Dr. Vogel's testimony that the CT scan did not show a massive stroke to eliminate any confusion created by defense counsel's opening statements as to Mr. Molinaro's undisputed cause of death.

Defendant also claims that this court erred by allowing Dr. Vogel, a radiologist, to simply identify where on the body a fracture shown on an x-ray was in relation to Mr. Molinaro's neck and to comment on whether the swelling and bruising noted on the ER records were consistent with a fracture in that location. (N.T. at 248-49.) Again, this testimony related solely to the case against Dr. Ramoska.

The defendant claims that Dr. Vogel, as a radiologist, was not qualified to discuss Mr. Molinaro's neck injuries in relationship to where the fracture was because that fell within the area of orthopedic surgery. (N.T. at 248-49.) Dr. Vogel testified during his qualifications that a radiologist's job is to read and interpret films, x-rays and CT scans, and to assist consulting physicians from other specialties (particularly when a patient has suffered trauma and the source of bleeding is unknown) in interpreting the studies and diagnosing a patient's problem. (N.T. at 101-106.) Defendant had no objection to his

qualifications in this area. (N.T. at 110-17.) Dr. Vogel's testimony fell fully within his area of expertise. See *Stalsitz v. Allentown Hospital,* 814 A.2d 766, 779 (Pa. Super. 2002).

The law is well settled that "[t]he admission of expert testimony is within the trial court's sound discretion and . . . will not [be] disturb[ed] . . . without a showing of manifest abuse of discretion." *Stalsitz,* 814 A.2d at 779. (citations omitted) Not only was the objected to testimony of Dr. Vogel admissible, but more importantly it did not relate to any theory of liability against Nurse Kunz. Defendant failed to demonstrate any prejudice it suffered by its admission.

D. *This Court Properly Refused To Grant a Mistrial After Plaintiff's Counsel Mentioned the Existence of a Lien Where Defense Counsel Stipulated to the Existence of the Lien and Suffered No Prejudice, and the Court Cured Any Potential Confusion With a Curative Instruction*

Citing no apposite appellate case law,[13] the defendant advances a novel theory under Pennsylvania law: using

---

13. The two appellate cases cited by defendant are not analogous to this case. In these cases, it was the plaintiff who objected to the defendants' mentioning to the jury that plaintiff had already received payments for the injuries. The appellate courts in those cases ruled that a new trial was appropriate because the evidence may have prejudiced the plaintiff by leading the jury to conclude that the plaintiff was seeking a double or triple recovery in damages. *Lobalzo v. Varoli,* 409 Pa. 15, 185 A.2d 557 (1962) (plaintiff was prejudiced because the jury was misled that he was attempting a double or triple payment); *Trump v. Capek,* 267 Pa. Super. 355, 406 A.2d 1079 (1979) (both sides agreed the evidence was inadmissible; plaintiff may have been prejudiced by its introduction).

the term "lien," rather than "medical expenses," irrevocably tainted the jury into finding liability and inflating damages. The defendant argues that this court erred in not declaring a mistrial after the plaintiff's counsel read a stipulation on medical expenses and then mentioned and defined the term "lien." The defendant claims that "it appears highly likely that the mention of the lien and the potential need to pay it back prejudiced the jury both in reaching a verdict and in the amount of their award." (Def. reply at 8.) Defendant's view is not supported by the record or the law.

The parties' dispute over terminology arose after both parties agreed that plaintiff should present the jury with the total amount of Mr. Molinaro's medical bills ($348,662.35). The parties agreed to present this stipulation, and prior to the jury entering the room plaintiff's counsel informed the court that "we have stipulations to the funeral costs, to the medical lien and to the employment status of Dr. Ramoska and Nurse Kunz." (N.T. at 338.) At that point, defense counsel did not object to the term "lien."[14] When trial resumed, plaintiff's counsel presented the stipulation to the jury: "The last stipulation is the medical lien due to Medicare and Blue Cross for

---

14. Plaintiff's counsel, Ms. Pitock, and defense counsel, Mr. Doyle, disagree as to whether defense counsel agreed to the exact wording of the stipulation, which referred to the lien. Ms. Pitock stated that she presented Mr. Doyle with a piece of paper that had the exact language she intended to read to the jury, and that she read it aloud to him as well. Mr. Doyle claimed he did not recall seeing it beforehand. (N.T. at 349-55.) The piece of paper Ms. Pitock showed Mr. Doyle did have the wording "medical lien" with the amount of the lien circled on it. This court's ruling did not hinge on whether or not Mr. Doyle read it when he agreed to the stipulation.

Ralph Molinaro's medical bills is $348,662.35." (N.T. at 344.) Defense counsel did not then object to the term "lien." This court then asked plaintiff's counsel to define the term "lien" to the jury:

"The court: Because a medical lien is not something that people talk about on a daily basis, if you could just explain to the jury what you mean by medical lien." (N.T. at 344.)

Again, defense counsel did not object to the term "lien." Plaintiff's counsel then gave the requested definition:

"Ms. Pitock: That is the amount that Medicare will ask to have paid back in the event that moneys are obtained. They assert a lien and they get that money back." (N.T. at 344.)

At this point, defense counsel objected to the introduction of the lien, argued that this constituted a violation of the collateral source rule, and requested a mistrial. (N.T. at 344-48.) This court did not grant a mistrial, but did issue the following curative instruction:

"The court: Okay. We were at the point where Ms. Pitock was going through what had been then agreed upon by the parties. And every once in a while we make a mistake. The part as to Nurse Steven Kunz and Dr. Ramoska, it's agreed upon by the parties that they are employees of Methodist Hospital, which was a stipulation. Then you also heard a stipulation as to the funeral bills being $6,867. That was correct.

"And then we just had a little mistake on the medical lien. So everybody take the delete button or your pen or whatever in your head and delete everything that we said

on the medical bills. Forget everything after we said what the funeral bills were and start anew.

"This is the stipulation on medical bills. So everybody promise me, looking at me, that you are disregarding everything you heard on medical bills. And now let's hear what the actual stipulation is which we have in writing now." (N.T. at 363-64.)

The defense initially contended that the stipulations and explanations of the lien violated the collateral source rule,[15] that they injected proof of insurance[16] into the case, and that the using and defining the term "lien" would irrevocably taint the jury in favor of the plaintiff. (N.T. at 345-46, 348, 355.) At oral argument on the defense motion for post-trial relief, defense counsel withdrew the issues of collateral source and proof of insurance, and proceeded solely on the novel theory that the use of the term "lien" was simply too prejudicial and swayed the jury in favor of plaintiff. (Hr'g on def.'s mot. for post-trial relief, 11/04/05 N.T. at 33-34.)

Defendant relies solely on a 1986 Court of Common Pleas decision, *Davin v. Shur-Line Manufacturing Co.,*

15. Plaintiffs, not defendants, have typically objected to informing the jury that a plaintiff has insurance or a collateral source of payment out of concern that the jury would be prejudiced against plaintiff by concluding that the plaintiff is seeking a "double recovery." This is the rationale behind the collateral source rule which precludes such information. See *Beechwoods Flying Service Inc. v. Al Hamilton Contracting Corporation,* 504 Pa. 618, 623, 476 A.2d 350, 353 (1984); *Lobalzo v. Varoli,* 409 Pa. 15, 185 A.2d 557 (1962). Defendant would not be prejudiced in this way.

16. While the term "insurance" never came up, this court will assume for the purpose of this appeal that the mention of Medicare is similar to the issue of insurance payments to the plaintiff. (Mem. of law in supp. of def.'s mot. for post-trial relief at 14-15.)

45 D.&C.3d 8 (Allegheny Cty. 1986), to support its position that the mere mention of a lien could sway the jury on both causation and damages. *Davin* is distinguishable from this case. *Davin* was a products liability action in which the defendant manufacturer conceded liability and the contested issue was the extent of the plaintiff's damages. In *Davin,* plaintiff's counsel informed the jury during the opening statement that the plaintiff had received $16,000 in worker's compensation benefits which had to be repaid due to a lien. The *Davin* court later granted a mistrial on post-trial motions, and speculated that:

"Such evidence [of the lien] could distract the jury's attention from causation. A jury with information of receipt of money for damages inflicted upon plaintiff might assume causation rather than determine it, because why else would a plaintiff be compensated [from workers' compensation] unless his injuries were the direct and proximate cause of defendant's negligence? The jury may get the impression that an average working man with a family to support who is injured through no fault of his own has incurred a substantial lien against him for which he is responsible whether or not he recovers against the third-party tort-feasor in the action before them." *Id.* at 11.

The *Davin* court's dictum on the issue of causation is inapplicable to this case. First, the defendant in *Davin* admitted that it was liable and that its product had caused the plaintiff some injury. It merely disputed that other later injuries claimed by the plaintiff were related to the original injury. Introducing that workers' compensation had paid the entire amount could have tainted the jury's

decision on the extent of damage. Furthermore, Medicare and workers' compensation are very different kinds of "insurance." Unlike workers' compensation, Medicare pays an insured's medical bills irrespective of liability so long as the billed procedures are medically justified. Unlike the plaintiff in *Davin*, the parties agreed about the extent of Mr. Molinaro's medical damage but rather disputed liability. It was this agreement on the extent of the damages that led to the jury hearing of the lien for medical expenses in the first place.

The jury's verdict belies defendant's theory that damages were inflated because of the lien: the jury found damages of $348,662.35 for medical costs which is the exact amount that the parties agreed were reasonably incurred. (See verdict form at 3; pl.'s pet. for delay damages, exhibit "D" at 4.) The jury did not overcompensate plaintiff by one penny for medical expenses incurred.

Defendant's primary support for its theory that mentioning the lien prejudiced the jury on liability stems from its perception that the jury's finding of liability against the nurse is inconsistent with finding no liability against the doctor. Not only is the verdict consistent with the evidence but the defendant provides no nexus between a jury learning that there is a lien and their purportedly wrongly finding liability.

Defendant could not demonstrate how the jury's sympathies or prejudices would be more aroused by the mention of a Medicare lien for $348,662.35 as opposed to a hospital bill for $348,662.35. The jury might be even more likely to develop sympathy upon hearing that an elderly widow living on social security owed several hundred thousand dollars to a hospital that might seek

to recover the debt. In fact, the jury's learning that Medicare already paid the medical expenses would be more likely to eliminate unfair sympathy for the plaintiff since they knew the medical bills have already been covered. See *Trump v. Capek,* 267 Pa. Super. 355, 406 A.2d 1079 (1979) (since plaintiff had been compensated for large portion of his damages, jury may have felt comfortable ruling against him on liability). There was no suggestion to anything other than Medicare getting paid back if the jury found in favor of plaintiff, not that plaintiff would get a double recovery nor that plaintiff would be expected to pay the money back to Medicare if it lost. Plaintiff's counsel explained to the jury that the significance of the lien as "the amount that Medicare will ask to have paid back *in the event that moneys are obtained.*" (N.T. at 344.)

Finally, this court's curative instruction eliminated any potential prejudice to the defendant. The Pennsylvania Supreme Court has stated that "[Appellate courts] are bound to presume that the jurors followed [a] curative instruction." *Commonwealth v. Robinson,* 581 Pa. 154, 243, 864 A.2d 460, 514 (2004).

### E. *With the Exception of the Damages Awarded for Lost Earning Capacity, the Amount of the Verdict Was Consistent With the Evidence Produced at Trial, and Was Neither Shocking Nor Excessive*

Defendant next claims that the jury's award of $583,785.35 was excessive and requires either a new trial or remittitur. A trial court should grant a new trial if the verdict is so excessive that it shocks one's sense of justice. *Botek v. Mine Safety Appliance Corp.,* 531 Pa.

160, 165, 611 A.2d 1174, 1176 (1992). The Pennsylvania Supreme Court has stated that the standard of review for a trial court's refusal to grant a new trial because of the excessiveness of a verdict is whether the trial court committed a gross abuse of discretion. *Botek, supra* at 165, 611 A.2d at 1176. Similarly, remittitur is appropriate "only when the award is plainly excessive and exorbitant . . . or whether the verdict so shocks the sense of justice as to suggest that the jury was influenced by partiality, prejudice, mistake, or corruption." *Haines v. Raven Arms,* 536 Pa. 452, 455, 640 A.2d 367, 369 (1994). The verdict in this case was neither excessive nor shocking and reflected a reasoned judgment by the jury to the evidence.

The jury's verdict was as follows:

*Wrongful Death Act:*

| | |
|---|---|
| Funeral expenses: | $ 6,867.00 |
| Medical expenses: | $ 348,662.35 |
| Future noneconomic loss in a lump sum (loss of services, physical comfort, society and affection Ralph Molinaro would have given to his family) | $ 75,000.00 |

*Survival Act:*

| | |
|---|---|
| Past loss of net earning capacity (social security and pension) of Ralph Molinaro in a lump sum | $ 39,133.00 |
| Future loss of net earning capacity (social security and pension) of Ralph Molinaro in a lump sum | $ 39,123.00 |

Past noneconomic loss in a lump
sum (such as physical pain, mental
anguish, discomfort, inconvenience
and emotional distress)                                   $ 75,000.00

          Total verdict         $583,785.35

The parties stipulated that $355,529.35 was the reasonable amount for funeral and medical costs for Mr. Molinaro. Thus, the defendant can only contend that jury's award of $75,000 for loss of services, physical comfort, society and affection, $75,000 for pain and suffering and $78,256 for past and future lost earnings were excessive and shocking. Defendant does not provide any reason why the noneconomic awards were excessive other than stating that "the decedent was 81 years old, with pre-existing medical problems. He was older than his expected life span." (Mem. of law in support of def.'s mot. for post-trial relief at 29.) However, defendant agreed at trial that Mr. Molinaro's life expectancy according to statistical tables was an additional 7.2 years at the time of his death.

There was more than sufficient evidence to support the jury's award of $75,000 to Mrs. Molinaro for the loss of services, physical comfort, society and affection she sustained when her husband died. Mrs. Molinaro lost the companionship and love she had from a man she had been happily married to for over 55 years according to the evidence. Mr. Molinaro was active up until he was hospitalized. He still drove and performed other chores around the house for approximately 20 hours a week. There was unrebutted expert testimony that Mr. Molinaro's lost household services were valued at $98,905. (Pl. exhibit 15 at 5; N.T. at 290-91.) If Mr. Molinaro lived the 7.2 expected additional years, the jury's verdict would

amount to $28.54 per day or $10,417 annually for Mrs. Molinaro's loss. This amount was hardly excessive based on the evidence.

Similarly, the jury's verdict of $75,000 for Mr. Molinaro's physical pain, mental anguish, discomfort, inconvenience and emotional distress that he experienced during the last seven weeks of his life was not unreasonable. It was uncontroverted that Mr. Molinaro was conscious, he was on a respirator and a feeding tube and he had three liters of blood removed from his chest that had been crushing his lungs. Mr. Molinaro communicated to Mrs. Molinaro that he was in pain. There was vivid and credible evidence from his family and experts supporting this damage award. The jury's award provided approximately $1,531 a day for the pain and suffering Mr. Molinaro endured during the last seven weeks of his life, an amount that certainly does not shock one's sense of justice.

Defendant also challenges the jury's award of $39,133 for past lost earning capacity and $39,125 for future lost earning capacity. Defendant contends that the jury did not factor in maintenance costs when awarding plaintiff past and future lost earning capacity, and claims that this court should have reduced the award accordingly. Upon further reflection, this court believes that defendant correctly identified a miscalculation by the jury, and requests that the Superior Court remand this case so that the court can mold the verdict to reflect the appropriate calculations.

Plaintiff's economic expert, Mr. David Hopkins, presented the jury with his calculations of Mr. Molinaro's past and future lost earnings, totaling $39,133 and totaling $39,125, respectively. (N.T. at 285-87.) Mr. Hopkins also testified that it was necessary to deduct anywhere

between 50-75 percent in personal maintenance expenses from both of the lost earnings figures. This testimony was uncontradicted. Despite Mr. Hopkins' testimony that the jury needed to deduct 50-75 percent from the earnings figures to account for personal maintenance expenses, the jury awarded $39,133 for past lost earning capacity and $39,125 for future lost earning capacity—the exact numbers used by Mr. Hopkins but without any deduction.

The Pennsylvania Supreme Court has held that an award for lost earnings in death cases must include a deduction for personal maintenance expenses. *Kiser v. Schulte,* 538 Pa. 219, 228, 648 A.2d 1, 5 (1994); *Incollingo v. Ewing,* 444 Pa. 299, 282 A.2d 228 (1971). In light of Pennsylvania law and the uncontradicted testimony of plaintiff's own expert, this court believes that the jury's award for past and future lost earning capacity should be molded to reflect a 50 percent deduction for personal maintenance expenses, and respectfully requests that the Superior Court remand this case for this specific calculation. With respect to the rest of the jury's verdict, this court properly denied defendant's request for either a new trial or remittitur since the verdict was not excessive or unreasonable.

F. *This Court Properly Granted Plaintiff's Petition for Delay Damages*

The defendant claims that this court erred in awarding the plaintiff delay damages.[17] It is well-settled that a

---

17. This court notes that the total amount of the delay damages should be reduced in accordance with a reduction in award for past and future lost earnings to correct for the jury's failure to account for maintenance expenses in their calculation as described above.

trial court's imposition of delay damages should not be reversed absent an abuse of discretion. *Potochnick v. Perry,* 861 A.2d 277, 286 (Pa. Super 2004).

Defendant claims that it is not responsible for delay damages[18] until September 21, 2004, the date that plaintiff provided defendant with an expert report supporting plaintiff's case. Defendant cites Rule 238(b)(2), which excludes for delay damage calculation purposes the period of time "during which plaintiff caused delay of the trial." Defendant posits that plaintiff caused a delay in trial because there was no viable medical malpractice case until plaintiff produced an expert report. Defendant further argues that it could not properly evaluate any claims for settlement purposes until plaintiff produced an expert report. (Mem. of law in support of def.'s response to pl.'s pet. for delay damages at 2-3.)

Defendant's argument ignores the plain language of Rule 238, which deals with the "delay of the trial." Defendant would extend this language to include essentially all pretrial activities. By defendant's logic, a party could plausibly claim that the Rule 238 calculation period should not begin until after a plaintiff's claim has survived summary judgment, because only then would the defendant know that the plaintiff had a "viable claim." This court refuses to follow this line of reasoning. Rule 238 plainly states that the calculation period begins one year after the date of the original service of process, with the only qualification that the plaintiff not cause a delay in the trial. There is no evidence in this case that the plaintiff delayed the trial date in any way.

---

18. Defendant does not dispute the calculations made by this court other than by arguing that plaintiff caused a delay in trial.

Defendant finally contends that it should not pay delay damages because Rule 238 is unconstitutional. Defendant raises numerous constitutional arguments, claiming that Rule 238 abridges the substantive rights of defendants and enlarges those of plaintiffs, that it creates an "irrebuttable" presumption that defendants are responsible for causing delay, that its "difference in treatment" of plaintiffs and defendants bears no reasonable relationship to the rule's legitimate objective, and that it "unduly inhibits" defendants from defending claims made against them in court. (Def.'s mem. of law in opp'n to pl.'s pet. for delay damages, at 5-12.) The Pennsylvania Supreme Court[19] has already rejected a constitutional challenge to Rule 238 in *Costa v. Lauderdale Beach Hotel,* 534 Pa. 154, 626 A.2d 566 (1993).

## V. CONCLUSION

For the above stated reasons, the Superior Court should affirm this court's denial of defendant's motion for post-trial relief with the exception of this court's request that the case be remanded to mold the verdict and delay damages to deduct reasonable maintenance expenses from the past and future loss earnings damage award.

---

19. The Superior Court has specifically stated that only the Supreme Court can consider the constitutionality of Rule 238. "'We have noted that because Rule 238 was promulgated by our Supreme Court, it would be inappropriate for this court to hold it unconstitutional. Thus, any determination regarding the constitutionality of the rule can only emanate from the Supreme Court.' *Fiorenza v. Kohn,* 396 Pa. Super. 1, 577 A.2d 1384, 1387 (1990). (citation omitted)" *Putt v. Yates-American Mach. Co.,* 722 A.2d 217, 227 n.12 (Pa. Super. 1998).